[This opinion has been published in *Ohio Official Reports* at 88 Ohio St.3d 292.]

ORMET PRIMARY ALUMINUM CORPORATION, APPELLANT, *v*. EMPLOYERS
INSURANCE OF WAUSAU ET AL., APPELLEES.

[Cite as *Ormet Primary Aluminum Corp. v. Employers Ins. of Wausau*,
2000-Ohio-330.]

*Insurance—Environmental claims—Notice to insurer of accident or suit—"As soon
as practicable," construed.*

A provision in an insurance policy requiring notice to the insurer "as soon as
practicable" requires notice within a reasonable time in light of all the
surrounding facts and circumstances. (*Ruby v. Midwestern Indemn. Co.*
[1988], 40 Ohio St.3d 159, 532 N.E.2d 730, approved and followed.)

(No. 98-2456—Submitted October 20, 1999—Decided April 5, 2000.)

APPEAL from the Court of Appeals for Monroe County, No. 808.

————————————

{¶ 1} Since 1958, Ormet Primary Aluminum Corporation ("Ormet") has
owned and operated an aluminum manufacturing facility near Hannibal, Ohio
("Site"), on the Ohio River. The design of the Site included two "Ranney Wells"
(one of which is now located on adjacent property). The wells were to be a source
of manufacturing water (process water) and drinking water for Ormet's employees.
The Site was to include an open, unlined disposal pit known as a "pond" or
"lagoon," into which Ormet would dump its liquid effluent manufacturing wastes.
A 1956 hydrogeological study, prepared by the F.H. McGraw Company
("McGraw"), warned Ormet of potential Ranney Well contamination from the
contemplated disposal ponds and suggested two "remedial methods": (1) seal the
bottom of the ponds and (2) install a well to intercept and pump out contaminated
groundwater before it reached the Ormet Ranney Well. Ormet did not line the

ponds and was forced to install interceptor wells approximately seventeen years later.

{¶ 2} By 1966, Ormet knew that water drawn from its Ranney Well was contaminated with twenty-four parts per million ("ppm") of fluorides, an amount as much as twelve times the drinking water standard of the time. By July and August 1971, the water in Ormet's Ranney Well turned black and contained high levels of fluorides. The contamination was attributed to the effect of caustic liquid wastes (fluorides and cyanides) leaching from the unlined bottom of Ormet's disposal ponds and the spent potliner storage area.

{¶ 3} The contaminates in the Ranney Well process water caused a precipitation of organic and iron materials in the heat exchanges on the systems used to cool the aluminum during the manufacturing process. Former Ormet Chief Chemist Joseph Baretincic called this a "significant problem" because Ormet used about 1,800 gallons of water per minute, twenty-four hours a day. Former Ormet Project Engineer Bernard Paidock characterized the situation as an "emergency" that had to be resolved "ASAP," or else "we couldn't operate the plant."

{¶ 4} In 1971, Ormet formed a Water Problems Committee to address the Ranney Well contamination. The first report, dated October 1971, acknowledged a "cyanide problem." Ormet learned that the Ranney Well contained ten parts per million cyanide—a level between fifty and two hundred times the 1971 drinking water and river discharge water standards. A groundwater treatment plant was considered as the one answer to all problems.

{¶ 5} In December 1971, Ormet retained Fred H. Klaer, Jr. & Associates to conduct a hydrogeological survey of the Site. One of the "primary purposes" of Klaer's work was to "consider the feasibility of preventing the flow of contaminated water from reaching the Ranney Well by some type of hydraulic barrier." Klaer produced four reports between 1972 and 1973, including the suggestion that construction of an interceptor well would serve to protect the

Ranney Well process water supply. The reports indicated that the interceptor well would be the most economic means of creating a hydraulic barrier between the potliner piles and the Ranney Well, which would assure the Ranney Well as a source of industrial water. The Klaer report also noted that the interceptor well water would need to be treated because it would be even more highly contaminated than that from the Ranney Well. Ormet installed and commenced operation of an interceptor well in December 1972; however, the interceptor well water was not treated but instead funneled through a storm sewer into the Ohio River.

{¶ 6} In May 1975, Ormet received its first five-year National Pollution Discharge Elimination System or "NPDES" permit from the state of Ohio authorizing Ormet to discharge wastewater into the Ohio River. Ormet's 1975 NPDES permit limited the level of acidity (pH) and contamination from total suspended solids, fluorides, and residual chlorine. The permit contained no reference to cyanide.

{¶ 7} Shortly before the NPDES permit was issued, two Ormet Engineering Department memoranda highlighted Ormet's knowledge of its cyanide problem and its knowledge that the state was unaware of the problem. In addition, the memoranda indicated that unless Ormet cut back on its interceptor well pumping rate, it risked possible revocation of the permit plus civil and criminal liability for noncompliance.

{¶ 8} In 1976, Baretincic sent an internal memorandum to Eugene Bolo, former director of corporate engineering, in order to lay out for Bolo potential costs in the future for environmental regulatory matters. Baretincic stated that pending legislation could result in prohibiting the introduction of any pollutant to the underground aquifer or limiting the amounts, and acknowledged that building a groundwater treatment plant would probably be in excess of $3,000,000, in addition to exorbitant operating costs for ion exchange chemicals.

{¶ 9} A May 1977 report by Bolo confirmed that, despite the two interceptor wells installed in 1972, Ormet's "underground aquifer contamination" problem continued as predicted due to continued leaching from the disposal ponds and runoff from the uncovered potliner storage piles. In July 1977, Ormet's groundwater consultant, Dames & Moore, found impermissibly high cyanide levels and fluoride concentrations in the groundwater that were as much as 500 times the national limits. Dames & Moore recommended that Ormet place a clay cover over the unlined disposal ponds and further advised that a clay cover be installed over the potliner storage area. Later in 1978, Dames & Moore expanded its recommendation to the entire cleanup of the potliner storage area. Ormet did not follow these recommendations.

{¶ 10} In May 1980, Ormet's Site was classified a "major discharger" into the Ohio River under the federal Clean Water Act, and Ormet was required to have its outfall discharges tested by an independent laboratory. That report, which was provided to the Ohio Environmental Protection Agency ("Ohio EPA") in June 1981 as required by the relevant regulations, revealed that Ormet was discharging high concentrations of complex cyanides into the river.

{¶ 11} In September 1981, the Ohio EPA wrote to Ormet about its discovery that Ormet was discharging high concentrations of cyanide into the Ohio River. Later in October 1981 and January 1982, the Ohio EPA noted the "extremely high" concentrations of cyanide in Ormet's discharges into the Ohio River.

{¶ 12} After the Ohio EPA became aware of the cyanide contamination, Ormet began to develop a process to treat the underground water prior to discharge into the Ohio River. In an October 1982 letter to the Ohio EPA, Ormet acknowledged that a water treatment plant would cost an estimated $2,500,000. Ormet developed a chemical treatment process plan for the cyanides for its

groundwater discharges, but argued against implementing any treatment because of the costs.

{¶ 13} In July 1983, Ormet's former environmental manager, T.A. Hermeling, reported to Bolo his perception of a recent meeting with the Ohio EPA. Hermeling believed that the Ohio EPA would probably recommend that an order be issued to Ormet requiring a geological survey to determine the cause of the aquifer contamination and a course of action to clean it up.

{¶ 14} In September 1985, the United States Environmental Protection Agency ("USEPA") nominated the Hannibal Site for inclusion on the USEPA's National Priorities List ("NPL"). The NPL is the list of the nation's worst pollution sites and is designated to identify those facilities and sites that appear to warrant remedial actions. Nomination for the NPL appears to be the first step in the remediation process as outlined in the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), otherwise known as the "Superfund."

{¶ 15} In November 1985, Ormet retained the law firm of Eckert, Seamans, Cherin & Mellott to file "Comments" with the USEPA, opposing the NPL listing. The Comments explained that Ormet had already retained hydrogeological consultants, Geraghty & Miller, Inc., to investigate the Site.

{¶ 16} In May 1986, a letter went out under Bolo's signature to the USEPA confirming Ormet's understanding that remedial action would be taken: "Once we have received Geraghty & Miller's written report, we intend to move promptly to select a remedial plan and issue contracts for the work required to implement the remedial plan." Geraghty & Miller geologist Robert Fargo, the principal drafter of the CERCLA Remedial Investigation ("RI") Report for the Site, testified that he informed Ormet that the cost of remediating the Site would "cover quite a broad range from hundreds of thousands to tens of millions" of dollars.

**{¶ 17}** The USEPA is statutorily required to consider a "no action" alternative for all of its CERCLA remediations. However, Bolo testified that as of the date that Ormet "was on the NPL," "[w]e didn't believe that there was a potential that we wouldn't have to do anything." In addition, Ormet consultant Fargo testified that "[t]here are very few, if any, Superfund sites that I'm aware of where a no-action alternative is, in fact, adopted."

**{¶ 18}** In April 1986, Ormet received a Potentially Responsible Party ("PRP") letter from the USEPA informing Ormet that it was potentially responsible for the contamination at the Site and "may be liable for all costs associated with removal or remedial action and all other necessary costs incurred in cleaning up the site, including investigation, planning and enforcement."

**{¶ 19}** In September 1986, Ormet's C.E.O., Emmett Boyle, led a leveraged buyout of Ormet. Former Ormet board member and shareholder Charles Bradley testified that he and Boyle purchased Ormet in 1986 knowing that the groundwater was contaminated and that the purchase price presumably reflected the existence of that contamination.

**{¶ 20}** In a January 1987 meeting, Boyle provided the following information to the newly elected board of directors: (1) The costs of construction of a water treatment plant at the Site to treat the contaminated groundwater was expected to be approximately $3,000,000, and (2) The CERCLA-mandated site study ("RI/FS") was expected to cost approximately $1,000,000. In light of this information, Ormet's board authorized over $1,000,000 to be spent in 1987 to perform the Remedial Investigation/Feasibility Study ("RI/FS") pursuant to the USEPA's CERCLA claim.

**{¶ 21}** The USEPA formally placed the Ormet site on the NPL in March 1987. In the same month, Boyle signed a thirty-eight-page settlement agreement, in the form of an Administrative Order by Consent ("AOC"), with the USEPA and the Ohio EPA without notifying or obtaining the consent of any of Ormet's insurers.

In the settlement, Ormet agreed to conduct the RI/FS, submit a Statement of Work, and reimburse the government agencies overseeing the RI/FS for their "oversight" costs at the Site.

{¶ 22} In May 1987, independent of the CERCLA proceedings, the Ohio EPA ordered Ormet to begin treating its river discharge. The Director's Final Findings and Orders ("DFFOs") required Ormet to design, construct, and operate a treatment plant for the cyanide-contaminated groundwater that Ormet had been discharging into the Ohio River for years previously. Ormet appealed the DFFOs to the Ohio Environmental Board of Review.

{¶ 23} In his deposition, Boyle acknowledged that, as of May 1988, he believed that the ultimate solution to the known contamination at the Site would be more extensive than just a groundwater treatment plant. When asked to quantify the cost of the solution, Boyle replied: "Yes, I think that in my mind's eye has always been like the $3 million to $8 million should have solved the problem."

{¶ 24} In late 1988, Ormet's then vice-president of engineering and environmental services, Bolo, attended a seminar in Washington, D.C., on insurance coverage for environmental claims. Bolo sent a memo to Ormet Treasurer D.P. Murphy, outlining his interest in establishing insurance coverage. On March 1, 1989, Ormet's tax and insurance administrator, Earl Weigand, responded to Bolo's memorandum and explained as follows: "I have also discussed the problem with our insurance broker, Marsh & McLennan, Columbus, Ohio, and they have advised me that all involved underwriters should be notified that a potential problem may exist at the Hannibal plant site. Marsh has offered to handle this notification work at their Columbus office, and I have prepared lists of underwriters and other data to assist them in this effort."

{¶ 25} Weigand further explained why he did not follow up with the notifications: "I felt that Gene Bolo was really controlling the situation. And Gene would have represented a higher level of management * * * than I am on, so if he

said notify or not notify, I would have done that. As it happened, I said I would do nothing until—until he advised me further, and he did not, so."

{¶ 26} On March 10, 1991, Bolo met with Ormet's accountants from Price Waterhouse to discuss various environmental issues. At this meeting, Bolo informed the accountants that Ormet had already spent $2 million for governmental oversight costs in connection with the RI/FS; the price range for constructing the interceptor well-water treatment plant would be $2.5 million to $3 million; and that the water treatment plant's operation costs were estimated to be approximately $800,000 per year.

{¶ 27} A May 1991 internal memorandum from Bolo to Boyle reports that the capital costs for the then-current remediation alternatives for the Site "range from approximately $7 million to $36 million."

{¶ 28} On June 7, 1991, Ormet settled its appeal of the 1987 Ohio DFFOs by agreeing to construct the NPDES-required groundwater treatment plant that Bolo had discussed with Price Waterhouse on March 10, 1991.

{¶ 29} On March 16, 1992, Ormet sent its first notice of "potential claims" involving CERCLA remediation. The letter states in relevant part: "Ormet recently has learned the tentative results of a risk assessment study conducted as part of a Remedial Investigation for the United States Environmental Protection Agency relating to Ormet's facilities in Hannibal, Ohio. The tentative results of the study indicate that Ormet in the future may need to take certain remediation measures at and in the vicinity of its Hannibal facilities in order to eliminate or reduce the alleged presence of certain substances in the environment. At this time, the nature and extent of such remediation measures, if any, and the associated costs cannot be determined. Nevertheless, in the event that such costs are incurred, Ormet will make claims under the aforementioned liability insurance policies for indemnification for the costs incurred, including but not limited to costs of

8

remediation and costs of defending any litigation that may result in connection with this matter."

{¶ 30} For the period in question (June 10, 1957 through March 31, 1975), Ormet was covered by the following liability insurance policies: defendant-appellee Employers Insurance of Wausau, A Mutual Company ("Wausau") issued five primary-layer comprehensive general liability policies, covering the period June 10, 1957 through April 11, 1961. Defendant-appellee Globe Indemnity Company ("Globe") issued twelve primary-layer comprehensive general liability policies, covering the period April 11, 1961 through April 11, 1973. These primary-layer policies provided indemnity up to a limit of liability of $1,000,000 per occurrence and agreed to defend Ormet against suits.

{¶ 31} Defendant-appellee Underwriters at Lloyd's of London ("Lloyd's") severally subscribed to five umbrella liability insurance policies to respond to covered losses in excess of the underlying Wausau and Globe policies for the period March 31, 1960 through March 31, 1969. Defendant-appellee Home Indemnity Company ("Home") issued two excess liability insurance policies covering losses in excess of the underlying coverage for the period March 31, 1969 through March 31, 1975, and provided up to $5,000,000 in coverage per occurrence excess of the primary coverage. These Home policies provided up to $5,000,000 in coverage per occurrence in excess of the primary coverage.

{¶ 32} On July 3, 1995, Ormet filed in the Monroe County Court of Common Pleas a complaint for declaratory judgment, damages, and other relief against the primary insurers (Wausau and Globe) and the excess insurers (Lloyd's and Home) that provided liability coverage to Ormet at various times from the late 1950s until the early 1970s. The insurers filed a joint motion for summary judgment claiming that their insurance policies require Ormet to notify them, in a timely fashion, of the events or incidents that might lead to a claim or of any claims made by or against Ormet. They claimed that Ormet failed to give timely notice of

(1) the environmental accidents/occurrences at the Site and (2) the demands made by the USEPA.

**{¶ 33}** Representative language of the insurance policies issued by Wausau contains the standard-form notice provisions common to other comprehensive general liability policies of the time, requiring that:

"When an [occurrence] occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. * * *"

**{¶ 34}** Wausau policies also provide that:

"If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons, or other process received by him or his representative."

**{¶ 35}** Insurance policies issued to Ormet by Globe contain essentially similar terms with one qualification, added by endorsement, which states:

"It is agreed that the words 'as soon as practicable' contained in conditions ten and eleven of the policy [conditions requiring notice of accident or suit] shall mean after an accident or suit becomes known to the Insurance Department of the Insured at P.O. Box 176, Hannibal, Ohio." Further, the policy says that "no action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all of the terms of [the] policy."

**{¶ 36}** The notice provision in the excess insurance policies is substantially different. For example, the Home policies provide that:

"Whenever the Insured has information from which the Insured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the Insured should be held liable, is likely to involve this Policy, notice shall be sent to The Home Insurance Company * * * as soon as practicable[;] provided, however, that failure to notify the above firm of any occurrence which at the time of its happening did not appear to involve this

Policy, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims."

{¶ 37} The trial court granted the appellees' joint motion for summary judgment due to Ormet's late notice and dismissed the case with prejudice. Ormet appealed and the Monroe County Court of Appeals affirmed.

{¶ 38} This cause is now before this court upon the allowance of a discretionary appeal.

————————————

*Neal R. Brendel* and *Paul K. Stockman, pro hac vice*; and *Yoss & Hampton* and *Richard M. Yoss*, for appellant.

*Hugh C. Griffin, Alfred L. Buchanan* and *Stephen M. Murray, pro hac vice; Arter & Hadden* and *Irene C. Keyse-Walker; Roetzel & Andress* and *Bradley L. Snyder;* and *Law Offices of James W. Peters* and *James W. Peters*, for appellees Certain Underwriters at Lloyd's of London.

*Gallagher, Sharp, Fulton & Norman, Robert H. Eddy, Alton L. Stephens* and *Alexander E. Goetsch;* and *Hanlon, Duff, Paleudis & Estadt Co., L.P.A.*, and *Gerald P. Duff,* for appellee Globe Indemnity Company.

*Burech & Crow* and *Stanley G. Burech; David C. Linder* and *Roger B. Frederickson, pro hac vice;* and *Reminger & Reminger Co., L.P.A.*, and *Clifford C. Masch*, for appellee Employers Insurance of Wausau, A Mutual Company.

*Gottlieb, Johnston, Beam & Dal Ponte* and *Jeffrey Robert Beam;* and *David J. Bloss*, *pro hac vice,* for appellee Home Indemnity Company.

*Crabbe, Brown, Jones, Potts & Schmidt, Larry H. James* and *Amy Fulmer Stevenson*, urging affirmance for *amicus curiae*, Ohio Association of Civil Trial Attorneys.

*Keener, Doucher, Curley & Patterson, Thomas Joseph Keener* and *Amy K. Schermer*, urging affirmance for *amicus curiae*, Insurance Environmental Litigation Association.

*Jones, Day, Reavis & Pogue* and *Brian F. Toohey*, urging reversal for *amici curiae*, Cleveland Cliffs, Inc. and Lincoln Electric Company.

*Paul A. Rose, Keven Drummond Eiber* and *Brouse McDowell*, urging reversal for *amici curiae*, Ohio Chemical Council, Inc., BP Amoco Corp., PPG Industries, Inc., RPM, Inc., B.F. Goodrich Company, and Goodyear Tire and Rubber Company.

_____

**LUNDBERG STRATTON, J.**

{¶ 39} Today we are asked to decide whether the court of appeals erred in affirming the trial court's granting of the appellees' joint motion for summary judgement due to Ormet's unreasonably late notice to its insurance carriers. We find no error and therefore we affirm the judgment of the court of appeals.

{¶ 40} Pursuant to Civ.R. 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Further, "summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." Civ.R. 56(C).

{¶ 41} The principal purpose of Civ.R. 56(E) is to enable movement beyond allegations in pleadings and to analyze the evidence so as to ascertain whether an actual need for a trial exists. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47. Because it is a procedural device to terminate litigation, summary judgment must be awarded with caution. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 604 N.E.2d 138.

{¶ 42} While the question of whether the insured met the notice condition is usually a question for the jury, an unexcused significant delay may be unreasonable as a matter of law. In order to determine whether the trial court's granting of summary judgment was proper, the first question we must decide is whether Ormet provided timely notice of its claims. The trial court found that no question of fact existed on this issue and that the notice of claims provided to the insurers was late as a matter of law.

{¶ 43} The applicable language of the primary insurers' policies (Wausau's and Globe's) is:

"When an accident [occurrence] occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. * * *"

{¶ 44} These policies also require immediate notice to the insurer if a claim is made or suit is brought against the insured. Further, Globe's policies contain an added endorsement: "It is agreed that the words 'as soon as practicable' contained in conditions ten and eleven of the policy [conditions requiring notice of accident or suit] shall mean after an accident or suit becomes known to the Insurance Department of the Insured at P.O. Box 176, Hannibal, Ohio."

{¶ 45} Globe's policies define "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." In addition, Wausau's policies define "occurrence" as "an accident or a continuous or repeated exposure to conditions resulting in injury during the policy period, except exposure to a condition created, induced or allowed to exist by the insured after it is evident that bodily injury, sickness, disease or death may result from continued exposure to such condition."

{¶ 46} The excess policies (Lloyd's and Home's) contain notice provisions that require notice when it appeared that the loss was likely to exhaust the primary

insurance coverage: "Whenever the Insured [Assured] has information from which the Insured [Assured] may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the Insured [Assured] should be held liable, is likely to involve this Policy, notice shall be sent to [the Company] as soon as practicable[;] provided, however, that failure to notify the above firm of any occurrence which at the time of its happening did not appear to involve this Policy, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims."

**{¶ 47}** A provision in the Home policies defines "occurrence" as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."

**{¶ 48}** We turn to the undisputed facts concerning notice in order to determine whether Ormet complied with the notice provisions in its insurance policies. By 1966, Ormet knew that the water drawn from its Ranney Well was contaminated with twenty-four ppm of fluorides, an amount as much as twelve times the drinking water standard of the time. By 1971, when Ormet's Water Problems Committee's first report noted a "cyanide problem," Ormet knew that the Ranney Well contained ten ppm cyanide, a level between fifty and two hundred times the 1971 drinking water and river discharge water standards. Shortly before the NPDES permit was issued in 1975, engineering department memoranda again indicates Ormet's knowledge of its cyanide problem and its knowledge that the Ohio EPA was unaware of the problem.

**{¶ 49}** By 1976, an internal memorandum from Ormet Chief Chemist Baretincic to then Director of Corporate Engineering Bolo acknowledges that building a groundwater treatment plant to remedy the contamination problem

14

would probably be in excess of $3,000,000. By July 1977, Ormet's groundwater consultant, Dames & Moore, notified Ormet of cyanide levels and fluoride concentrations in the groundwater that were as much as 500 times the national limits. By 1981, a report was provided to the Ohio EPA, as provided by relevant regulations, that revealed that Ormet was discharging high concentrations of complex cyanides into the river.

{¶ 50} By 1983, Ormet believed that the Ohio EPA would probably require a geological survey to determine the cause of the aquifer contamination and a course of action to clean it up. By 1985, the USEPA nominated the Hannibal Site for inclusion on the USEPA's National Priorities List, otherwise known as the Superfund.

{¶ 51} By April 1986, Ormet was aware that the USEPA had found Ormet to be a potentially responsible party for the contamination with possible liability for all costs associated with removal or remedial action and all other necessary costs incurred in cleaning up the Site. By 1987, Ormet was formally placed on the NPL, and Ormet signed a thirty-eight-page settlement agreement, Administrative Order by Consent, with the USEPA and the Ohio EPA. By 1988, Ormet acknowledged that the cost of the solution to the contamination was between $3,000,000 and $8,000,000.

{¶ 52} By 1989, Ormet had discussed the contamination problem with its insurance broker and knew that it should notify all insurers that a potential problem might exist at the Site. By 1991, Ormet had already spent $2 million for governmental oversight costs and contemplated that the price range for constructing the interceptor well-water treatment plant would be $2.5 to $3 million.

{¶ 53} Ormet sent its first notice of potential claims to its insurers in March 1992. The trial court and the court of appeals held that Ormet knew in 1976 that it was liable for its contamination and that the liability was likely to exceed $1,000,000. The trial court and the appellate court concluded that Ormet's notice

to both its primary and excess insurers was unreasonable, as a matter of law. We agree.

{¶ 54} Ormet appears to argue that while it was aware of the environmental contamination, it was not aware until much later that any governmental regulatory action would be taken against it. However, this clearly relates to notice of claim, not notice of occurrence. Moreover, as for the claim that Ormet did not see the need to notify its insurers until after the CERCLA legislation was passed, even before CERCLA, water pollution laws always existed in Ohio. See R.C. 6111.01 *et seq.*

{¶ 55} In addition, Ormet appears to argue that a genuine issue of material fact exists with respect to the Globe primary policy requiring notice as soon as practicable after an accident or suit becomes known to Ormet's Insurance Department, and with respect to the excess policies. Yet, the record contains a memo dated March 1, 1989 from Ormet's insurance administrator to Vice-President Bolo acknowledging that he was aware of "the problem" at the Hannibal Site and had discussed it with Ormet's insurance broker. This occurred more than three years before Ormet sent its first notice of "potential claims" to its insurers.

{¶ 56} Notice provisions in insurance contracts serve many purposes. Notice provisions allow the insurer to become aware of occurrences early enough that it can have a meaningful opportunity to investigate. *Ruby v. Midwestern Indemn. Co.* (1988), 40 Ohio St.3d 159, 161, 532 N.E.2d 730, 732. In addition, it provides the insurer the ability to determine whether the allegations state a claim that is covered by the policy. See *In re Texas E. Transm. Corp. PCB Contamination Ins. Coverage Litigation* (E.D.Pa.1992), 870 F.Supp. 1293. It allows the insurer to step in and control the potential litigation, protect its own interests, maintain the proper reserves in its accounts, and pursue possible subrogation claims. See *Am. Ins. Co. v. Fairchild Industries, Inc.* (E.D.N.Y.1994), 852 F.Supp. 1173, 1179.

Further, it allows insurers to make timely investigations of occurrences in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims.

{¶ 57} A provision in an insurance contract requiring "immediate" notice means that the notice must take place "within a reasonable time under the circumstances of the case." *Travelers' Ins. Co. v. Myers* (1900), 62 Ohio St. 529, 57 N.E. 458, paragraph four of the syllabus, overruled in part by *Employers' Liab. Assur. Corp. v. Roehm* (1919), 99 Ohio St. 343, 124 N.E. 223; *Heller v. Std. Acc. Ins. Co.* (1928), 118 Ohio St. 237, 160 N.E. 707. Similarly, we have held that "[a] provision in an insurance policy requiring 'prompt' notice to the insurer requires notice within a reasonable time in light of all of the surrounding facts and circumstances." *Ruby* at the syllabus. Thus, a notice provision requiring notice to the insurer "as soon as practicable" requires notice within a reasonable time in light of the surrounding facts and circumstances.

{¶ 58} The courts below went on to consider whether or not Ormet's untimely notice to its insurers resulted in prejudice to the insurers because the courts below held that untimely notice relieves an insurer of its obligation to provide coverage if the insurer can show prejudice as a result of the delay. The courts below concluded that unreasonable delay in the giving of notice may be presumed prejudicial to the insurer absent evidence to the contrary. In this case, we are not required to determine whether Ormet presented proof to rebut the presumption of prejudice because reasonable minds could only conclude that the appellees suffered actual prejudice from the delay.

{¶ 59} The first example of actual prejudice to the insurers is the list of witnesses who have died since the events giving rise to this litigation occurred. The following potential witnesses are now deceased:

{¶ 60} T.A. Hermeling was Ormet's "primary contact" with the Ohio EPA concerning the consent order for the RI/FS. He was the Ormet employee who was

principally responsible for responding to inquiries from the Ohio EPA. He kept all environmental records and reports.

{¶ 61} Fred Klaer was retained by Ormet in the early 1970s as a consulting hydrogeologist responsible for investigating the groundwater contamination at the Site. Klaer drafted at least four reports during his time as a consultant to Ormet and recommended in 1972 that Ormet install the interceptor wells.

{¶ 62} Tibor Gyoerkoes, the Chief Chemist at Ormet, collected the laboratory information that was reported to the Ohio EPA. He directed the water testing at the Site in the early 1970s, and in the early 1980s was responsible for Ormet's laboratories. He was also a member of the Water Problems Committee.

{¶ 63} Art Carter signed Ormet's October 1971 water discharge report, a report that makes no reference to cyanide but was submitted while Ormet's management was having internal discussions about the company's cyanide problem. He decided what information would be given to the state and was also a part-time member of the Water Problems Committee.

{¶ 64} Harry Zimmerman was the head of Ormet's Insurance Department from the early 1960s through the late 1970s and was responsible for purchasing most of the insurance policies at issue. Don Wilson was the primary attorney for Eckert, Seamans working on Ormet's environmental matters during this time. He was also Ormet's spokesperson. In addition, the F.H. McGraw Company, which designed the Hannibal Site, has gone out of business, and Ormet's primary contact at McGraw, Harry Brandeth, is deceased.

{¶ 65} Moreover, there are four or five witnesses who allegedly would have knowledge of Ormet's potliner disposal piles and the contents of its scrap dump, both of which are alleged sources of the current contamination at the Site. All of the above potential witnesses are deceased, clearly working actual prejudice to the insurers by depriving them of the opportunity to question the witnesses.

{¶ 66} In addition to witnesses who have passed on, memories fade. For example, there are four remaining members of the originally seven-member Water Problems Committee. By their own admission, and as a natural occurrence over twenty years, most agreed that their memories have faded. In addition, remaining Ormet employees do not recall the substance of the internal discussions regarding the recommendations in the Dames & Moore groundwater report.

{¶ 67} Other prejudice may result from documents or other evidence being lost or destroyed. In addition, certainly, the physical conditions of the Site have changed significantly over the past twenty years. In addition to opportunities for fraud, options available to the insurance companies rapidly diminish as time passes, leaving them to deal with decisions made by the insured that may not be in either the insured's or the insurer's best interest. The most glaring example of this type of prejudice is that Ormet unilaterally entered into a thirty-eight-page settlement agreement, in the form of an Administrative Order by Consent, with the USEPA and the Ohio EPA without notifying or obtaining the consent of its insurers. Ormet agreed in the AOC to conduct an RI/FS for the Site and to reimburse the governmental agencies' costs, now alleged to be over $1.7 million, in overseeing the RI/FS project.

{¶ 68} Ormet argues that it handled the environmental contamination remediation in the most efficient and cost-effective manner possible, and, therefore, the insurers were not prejudiced by the delay in giving notice. Ormet points to the deposition testimony of Marcia Williams of the USEPA, who stated that she carefully investigated and discussed the remedial actions taken at the Site, comparing them with remedies selected for other Superfund sites, and concluded that (1) the costs Ormet incurred prior to 1992 were integral and unavoidable, and (2) the remedies selected for the site are reasonable, and are less stringent and less costly than those implemented at other sites.

19

**{¶ 69}** We conclude that this is speculative at best. Further, we find Ormet's allegation that notifying the insurers in a timely manner would have resulted only in a prior denial of insurance coverage is purely conjecture. As such, these unsupported claims about what the insurers would have done if earlier notice had been given are immaterial.

**{¶ 70}** We hold that reasonable minds could not differ that Ormet failed to give timely notice to its insurers causing the insurers to suffer actual prejudice. Accordingly, the appellees were entitled to summary judgment as a matter of law. We affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY and COOK, JJ., concur.

PFEIFER, J., dissents.

_____

**PFEIFER, J., dissenting.**

**{¶ 71}** This is a case where conditions, potential liability, and the law were evolving and unfolding over time. There was no real "event" to measure timeliness. This case demands a jury's determination as to whether notice was timely.

**{¶ 72}** I would hold that the issue of prejudice to the insurers should also have been submitted to a jury. I believe reasonable minds could differ as to whether the insurers were prejudiced. Ormet's argument that its settlement with the USEPA and the Ohio EPA was as good as could be expected has some appeal. Also, Ormet's argument that denial of coverage was a foregone conclusion, making the timing of notice irrelevant, could also persuade a reasonable juror that the insurers were not prejudiced.

_____