**[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 512.]**

GOODYEAR TIRE & RUBBER COMPANY ET AL., APPELLANTS, *v*. AETNA
CASUALTY & SURETY COMPANY ET AL., APPELLEES.

[Cite as *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*,
2002-Ohio-2842.]

*Insurance—Continuous occurrence of environmental pollution triggers claims
under multiple insurance policies—Insured entitled to source coverage
from a single policy of its choice that covers all sums incurred as damages
during the policy period—Pollution exclusion clause in insurance contract
that bars coverage for expected or intended "emission, discharge, seepage,
release or escape" of contaminating materials is triggered, when.*

(Nos. 2000-1984 and 2001-0493—Submitted November 28, 2001—Decided June
26, 2002.)

APPEAL from the Court of Appeals for Summit County, No. 19121.

―――――――――――――

SYLLABUS OF THE COURT

1. When a continuous occurrence of environmental pollution triggers claims under
   multiple primary insurance policies, the insured is entitled to secure
   coverage from a single policy of its choice that covers "all sums" incurred
   as damages "during the policy period," subject to that policy's limit of
   coverage.

2. A pollution exclusion clause in an insurance contract that bars coverage for
   expected or intended "emission, discharge, seepage, release or escape" of
   contaminating materials is triggered when the policyholder expects or
   intends that the contaminants will migrate from the location in which they
   were first deposited.

―――――――――――――

**FRANCIS E. SWEENEY, SR., J.**

{¶1} In 1993, appellants, Goodyear Tire & Rubber Company and others (collectively "Goodyear"),[1] filed this action against appellees Aetna Casualty & Surety Company and several other insurance companies (collectively the "insurers")[2] seeking declaratory judgments concerning insurance claims for pollution cleanup costs at twenty-two sites. Numerous claims, defendants, and specific insurance policies were disposed of through pretrial motions. The remaining parties agreed to limit the evidence in this case to claims relating to two waste disposal sites. Those sites are the Motor Wheel Site in Lansing, Michigan, and the Army Creek Landfill in New Castle, Delaware.

{¶2} After Goodyear had presented its case at trial, the insurers moved for directed verdicts on various grounds. The trial court granted the directed verdicts to all defendants without providing a specific basis for its decision. The court of appeals reversed the trial court on a number of the motions for directed verdicts. No appeal has been taken from these reversals. The appellate court affirmed the trial court on the remaining motions for directed verdict. Goodyear asserts that this was error. The consolidated cases are now before this court pursuant to the allowance of discretionary appeals.

## I. Standard for Directed Verdicts

{¶3} At the outset, we are mindful of the standard of review for a directed verdict. According to Civ.R. 50(A)(4), a motion for directed verdict is granted if, after construing the evidence most strongly in favor of the party against whom the motion is directed, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." The "reasonable minds" test mandated by Civ.R. 50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party. Civ.R. 50(A)(4); *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 69, 23 O.O.3d 115, 430 N.E.2d 935.

**{¶4}** "A motion for directed verdict * * * does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence." *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraph three of the syllabus. See, also, *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252. Since we are presented with a question of law, we apply a de novo standard of review. *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1996), 76 Ohio St.3d 521, 523, 668 N.E.2d 889, 891. It is with these principles in mind that we consider Goodyear's assertions of error.

## II. Allocation

**{¶5}** In determining whether the directed verdicts were properly granted, we must first decide whether the lower courts erred in the method used to allocate insurance coverage among the multiple insurers. Allocation deals with the apportionment of a covered loss across multiple triggered insurance policies. Paar, Recovery is in the Details: Hot Issues in the Administration and Application of General Liability Insurance Policies (2000), 86 PLI/NY 199, 216. The issue of allocation arises in situations involving long-term injury or damage, such as environmental cleanup claims where it is difficult to determine which insurer must bear the loss.

**{¶6}** The parties are in agreement as to which primary insurance policies have been called into play, and there is no dispute that there was continuous pollution across multiple policy periods that gave rise to occurrences and claims to which these policies apply. However, they disagree as to the appropriate method for distributing losses across the triggered policies. There are two accepted methods for allocating coverage. One approach, favored by Goodyear, permits the policyholder to seek coverage from any policy in effect during the time period of injury or damage. This "all sums" approach allows Goodyear to seek full coverage for its claims from any single policy, up to that policy's coverage limits, out of the

group of policies that has been triggered. In contrast, the insurers urge us to apply the pro rata allocation scheme implicitly adopted by the court of appeals. Under the pro rata approach, each insurer pays only a portion of a claim based on the duration of the occurrence during its policy period in relation to the entire duration of the occurrence. It divides "a loss 'horizontally' among all triggered policy periods, with each insurance company paying only a share of the policyholder's total damages." Id. at 217. For the reasons that follow, we agree with Goodyear's position and adopt the "all sums" method of allocation.

{¶7} The starting point for determining the scope of coverage is the language of the insurance policies. The policies at issue require the insurer to "pay on behalf of the insured *all sums* which the insured shall become legally obligated to pay as damages because of * * * property damage to which this policy applies caused by an occurrence." (Emphasis added.) The policies define "property damage" as "injury to or destruction of tangible property *which occurs during the policy period* * * *."[3] (Emphasis added.) The italicized portions of this language provide the point of contention.

{¶8} It is well settled that "insurance policies should be enforced in accordance with their terms as are other written contracts. Where the provisions of the policy are clear and unambiguous, courts cannot enlarge the contract by implication so as to embrace an object distinct from that originally contemplated by the parties." *Rhoades v. Equitable Life Assur. Soc. of the U.S.* (1978), 54 Ohio St.2d 45, 47, 8 O.O.3d 39, 374 N.E.2d 643, citing *Motorists Mut. Ins. Co. v. Tomanski* (1971), 27 Ohio St.2d 222, 226, 56 O.O.2d 133, 271 N.E.2d 924.

{¶9} There is no language in the triggered policies that would serve to reduce an insurer's liability if an injury occurs only in part during a given policy period. The policies covered Goodyear for "all sums" incurred as damages for an injury to property occurring during the policy period. The plain language of this provision is inclusive of all damages resulting from a qualifying occurrence.

Therefore, we find that the "all sums" allocation approach is the correct method to apply here.

{¶10} Interpreting the policy language in this manner is a practice that has been frequently implemented in other jurisdictions. *Am. Natl. Fire Ins. Co. v. B & L Trucking & Constr. Co., Inc.* (1998), 134 Wash.2d 413, 428, 951 P.2d 250 (noting that the national majority rule forbids insurers from limiting their liability to a pro rata share unless the policy expressly allows it). In particular, support for this approach can be found in the frequently cited case of *Keene Corp. v. Ins. Co. of N. Am.* (C.A.D.C.1981), 667 F.2d 1034. In *Keene*, an action for declaratory relief was brought to discern the rights and obligations of parties under comprehensive general liability policies issued to an insured that was liable for bodily injuries arising from asbestos-related diseases. The asbestos was deemed to cause bodily injury in more than one policy period, and it was determined that multiple policies had been triggered. Id. at 1040. The court went on to rule that each insurer whose insurance policy had been triggered would be liable in full for the indemnification and defense costs of the insured relating to the asbestos claims. Id. at 1048. In reaching this conclusion, the *Keene* court noted that there was nothing in the triggered policies that "provides for a reduction of the insurer's liability if an injury occurs only in part during a policy period." Id. This being so, the court reasoned that the insured would have reasonably expected "complete security from each policy it purchased." Id.

{¶11} Like the insured in *Keene*, we are persuaded that Goodyear expected complete security from each policy that it purchased.[4] This approach promotes economy for the insured while still permitting insurers to seek contribution from other responsible parties when possible. Therefore, we find that when a continuous occurrence of environmental pollution triggers claims under multiple primary insurance policies, the insured is entitled to secure coverage from a single policy of its choice that covers "all sums" incurred as damages "during the policy period,"

5

subject to that policy's limit of coverage. In such an instance, the insurers bear the burden of obtaining contribution from other applicable primary insurance policies as they deem necessary.

{¶12} For each site, Goodyear should be permitted to choose, from the pool of triggered primary policies, a single primary policy against which it desires to make a claim. In the event that this policy does not cover Goodyear's entire claim, then Goodyear may pursue coverage under other primary or excess insurance policies. The answer to the question of what insurance may be tapped next is dependent upon the terms of the particular policy that is put into effect by Goodyear. At this juncture, we are unable to determine which policy Goodyear will invoke, and thus we are also unable to determine whether the primary policy limits will be exhausted. Since Goodyear may find it necessary to seek excess insurance coverage, we find that the lower court erred in granting directed verdicts in favor of the excess insurers. The excess insurers should be included in the proceedings so that their rights and obligations can be considered in the event that their policies become a factor. We reverse the judgment of the court of appeals on this question.

### III. Timely Notice

{¶13} The second issue concerns whether Goodyear gave timely notice to its insurers so as to trigger coverage for occurrences of pollution at the Motor Wheel Site. The insurance policies at issue required Goodyear to notify its insurers of an occurrence "as soon as practicable."[5] Additionally, they required Goodyear to give the insurers notice of a claim "immediately." The court of appeals affirmed the grant of directed verdicts on this issue, finding that the notice provided by Goodyear to its primary insurers was untimely and unreasonable as a matter of law. However, it did not reach the issue with respect to the excess insurers, since it had already granted them directed verdicts on the allocation issue.

6

**{¶14}** Notice provisions in insurance contracts are conditions precedent to coverage, so an insured's failure to give its insurer notice in a timely fashion bars coverage. *Owens-Corning Fiberglas Corp. v. Am. Centennial Ins. Co.* (C.P.1995), 74 Ohio Misc.2d 183, 203, 660 N.E.2d 770. In *Ormet Primary Aluminum Corp. v. Employers Ins. of Wausau* (2000), 88 Ohio St.3d 292, 725 N.E.2d 646, syllabus, we stated, "A provision in an insurance policy requiring notice to the insurer 'as soon as practicable' requires notice within a reasonable time in light of all the surrounding facts and circumstances." A similar requirement is applied to a provision that compels notice "immediately." Id. at 303, 725 N.E.2d 646. Generally, the question of timeliness calls into play matters to be discerned by the finder of fact; however, it is also true that "an unexcused significant delay may be unreasonable as a matter of law." Id. at 300, 725 N.E.2d 646.

**{¶15}** The court of appeals relied upon *Ormet* to find that the notice provided by Goodyear in the instant case was unreasonable as a matter of law. We disagree because *Ormet* is distinguishable on its facts. In that case, by 1966, the insured had knowledge of actual pollution caused by its actions. In 1986, the EPA formally identified the insured as a potentially responsible party. By 1987, the insured had signed a settlement agreement with federal and state government agencies that outlined its financial responsibilities for cleaning up contamination. Despite these events, the insured did not notify its insurers about potential claims until March 1992. Based on these facts, this court found that the timing of notice resulted in actual prejudice to the insurers and thus barred coverage.

**{¶16}** Here, however, the facts do not present such a clear manifestation of unreasonableness. In 1970, Goodyear received information from Michigan authorities indicating the potential for groundwater pollution at the Motor Wheel site. At two other times during the ensuing decade, it was asked to cease and desist some or all of its dumping activities at the site, and by 1981 Goodyear had notified the United States Environmental Protection Agency that contamination at the site

was likely. However, when correspondence from the local health department to the Michigan Department of Natural Resources dated December 1982 indicated that a single water well in the area should be monitored due to the presence of a chemical, nothing therein indicated that Goodyear was responsible. Goodyear nonetheless conducted an investigation into the pollution problem during a ten-year span beginning in 1982. It gave notice of the possibility of an occurrence to many of its insurers sometime between 1983 and August or October 1984, but testimony indicated that no cleanup was undertaken by Goodyear until at least 1992.

{¶17} Based on this evidence, we are not inclined to bypass the factfinder on the question of whether Goodyear's notice was unreasonably late. In *Ormet*, notice was provided to affected insurers some six years after the insured was identified by the EPA as a responsible party for pollution and some five years after the insured had entered into a settlement agreement dictating the terms of cleanup. In the instant case, no similar lapse in time occurred between an event so blatantly indicating an occurrence and the time of notice by Goodyear. Nothing in any of the relevant documents informed Goodyear that it would be responsible for cleanup costs, and Goodyear did not admit liability for such costs. Information and events were unfolding over time with such complexity that only the factfinder may resolve the issue of whether Goodyear's notice was unreasonable.

{¶18} After construing the evidence most strongly in favor of Goodyear, we find that reasonable minds could come to more than one conclusion as to whether Goodyear's primary and excess insurers received unreasonable notice. Directed verdicts in favor of the insurers on this question were therefore improper, and the judgment of the court of appeals is reversed.

IV. *Pollution Exclusion Provision*

{¶19} The final issue concerns the meaning of pollution exclusion clauses in certain insurance policies issued to Goodyear covering occurrences at the Army Creek Landfill. Each of these policies contained a provision that excluded coverage

for property damage "arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant * * * if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any insured * * *."

{¶20} The insurers argue that this provision should be construed to mean that if the policyholder intentionally placed contaminants into a landfill, that act is enough to forfeit coverage. Goodyear counters that the exclusion applies only to the migration of contaminants from the place of deposit and not to the initial placement. It argues that since it did not expect or intend for harmful chemicals to migrate from the landfill, the pollution exclusion clause cannot bar coverage. The court of appeals adopted the insurers' reasoning.

{¶21} We construe insurance provisions in accordance with the rule that "an exclusion in an insurance policy will be interpreted as applying only to that which is *clearly* intended to be excluded." (Emphasis in original.) *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096. While looking at the plain meaning of similar language, the court in *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.* (D.N.J.1993), 842 F.Supp. 125, noted that the terms "discharge, dispersal, release or escape" all were undefined terms in the subject policy. However, it found that "[a]ll of these terms intrinsically evoke a transition from a state of confinement to movement." Id. at 131. A number of the highest courts from other states have construed these terms in a similar fashion. *Queen City Farms, Inc. v. Cent. Natl. Ins. Co. of Omaha* (1994), 126 Wash.2d 50, 882 P.2d 703; *Compass Ins. Co. v. Littleton* (Colo.1999), 984 P.2d 606; *Alabama Plating Co. v. U.S. Fid. & Guar. Co.* (Ala.1996), 690 So.2d 331.

{¶22} Just as in those cases, here the insurers included language in the pollution exclusion provisions that they failed to define but which has a plain meaning. The terms "emission, discharge, seepage, release or escape" require some sort of movement by a contaminant from one location to another. For instance, one

definition of the word "escape" is "flight from confinement." Webster's Ninth New Collegiate Dictionary (1984) 424. "Disperse" means "to spread or distribute from a fixed or constant source." Id. at 365. These terms incorporate the concept of a leakage or discharge, such as through cracks or other outlets. They indicate that the relevant event invoking the pollution exclusion clause is the intentional movement of contaminants from the Army Creek Landfill rather than the act of initially placing pollutants there. If the insurers had meant their pollution exclusions to apply to acts such as depositing or placing chemicals in the ground, they could have used language that more perfectly described those actions.

{¶23} A pollution exclusion clause in an insurance contract that bars coverage for expected or intended "emission, discharge, seepage, release or escape" of contaminating materials is triggered when the policyholder expects or intends that the contaminants will migrate from the location in which they were first deposited. Based on the record before us, we find evidence indicating that any migration of pollutants from the Army Creek Landfill was unexpected and unintended. When Goodyear was depositing the wastes, it did not believe that they were pollutants. Also, at the time, the widespread belief was that chemicals deposited in a landfill would be contained and would remain where they were initially placed. Representative cases recognizing this school of thought include *Compass Ins. Co.,* supra, and *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.* (Minn.App.1992), 480 N.W.2d 368. Testimony shows that Goodyear believed disposal of the wastes at a landfill was safe. Thus, the directed verdicts on this issue were erroneous, since factual questions exist as to whether Goodyear expected or intended pollutants to migrate to surrounding groundwater.

{¶24} Accordingly, for the above reasons, the judgment of the court of appeals is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.

Judgment reversed

and cause remanded.

RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., DOUGLAS and F.N. YOUNG, JJ., dissent.

FREDERICK N. YOUNG, J., of the Second Appellate District, sitting for COOK, J.

_____

FREDERICK N. **YOUNG, J., dissenting**.

**{¶25}** I respectfully dissent from the decision of the majority regarding the issue of allocation, although I agree with the majority in all other regards.

**{¶26}** The majority adopts an "all sums" approach to the allocation of insurance coverage among multiple insurers. This method allows an insured to choose one of its multiple carriers to reimburse it for all costs incurred—even though covered by other insurance carriers—when the injury is continuous and cannot be attributed to one period covered by only one insurance carrier. As the majority points out, this leaves "the insurers [to] bear the burden of obtaining contribution from other applicable primary insurance policies as they deem necessary." I find that this approach ignores the plain language of the insurance contract, flies in the face of the majority rule, and contravenes plain common sense.

**{¶27}** As the majority correctly notes, the starting point for determining the scope of coverage is the language of the insurance policies, and the policies at issue require the insurer to "pay on behalf of the insured *all sums* which the insured shall become legally obligated to pay as damages because of * * * property damage to which this policy applies caused by an occurrence." (Emphasis added.)

**{¶28}** "Property damage" is defined in the insurance policy as "injury to or destruction of tangible property *which occurs during the policy period * * *.*" (Emphasis added.) The majority focuses on only the "all sums" language and virtually ignores the requirement that the injury must occur during the policy period. In the case before us, as in most cases involving continuous injury

11

occurring under many different policy periods, it is impossible for the insured to prove the extent of the injury that occurred during the policy period of the insurance carrier being targeted. The majority accepts the fact that the injury occurred here *only in part* during the given policy period. It falls to logical interpretation of the contract that the phrase "all sums" is limited by the insurance contract to all sums arising during the policy period. The insured and the carrier here bargained for only a limited period of time of coverage for an injury that arose before the coverage and continued to exist after it, and the premium was therefore based upon that bargained-for coverage. Each insurance carrier's liability is therefore limited to only that part of the total injury that occurred within a particular carrier's coverage dates. Since that portion of the injury cannot be proven by direct evidence in dollar terms, the only way to allocate coverage is to attribute the losses to the various insurance carriers that provided coverage throughout the policy periods. That approach, which was adopted by the court of appeals, gives effect to all the language of the insurance contract and not just to the two isolated words "all sums."

{¶29} If this court were to affirm the court of appeals on the allocation issue, it would be in line with the majority of jurisdictions that, in the context of continuing environmental damage from pollution, have adopted rules allocating damages among multiple periods of coverage. As noted by William P. Shelley, Fundamentals of Insurance Coverage Allocation (Jan. 5, 2000), Mealey's Litigation Reports (Insurance) 25, 30, "[t]he vast majority of courts have rejected the joint and several (or 'pick and choose') approach to allocation."

{¶30} Finally, I note that under the "all sums" approach, the insurance carrier chosen by the insured would bear the burden of obtaining contribution from other applicable primary insurance carriers as it deems necessary. This is a fundamentally flawed conclusion because the insured, not the targeted insurance carrier, is the one that chose the other insurance carriers. Some carriers may not be liable to the targeted carrier for such contribution or may in fact lack the financial

resources to contribute. Why should the targeted carrier bear that financial burden when it did not choose the other carriers? The insured, since it did choose the other carriers, should logically and in all fairness bear that burden of obtaining the proper share of coverage from each of the other carriers. Indeed, for some periods of time during the continuous pollution, the insured may have acted as self-insured and should therefore bear its portion of the allocation of the total damages. It should not be able to seek complete reimbursement from a carrier that did not provide coverage through any of those other periods of time.

{¶31} The court of appeals here properly allocated coverage among all the insurance carriers who covered separate portions of the time periods of the continuous pollution. I would affirm the judgment of the court of appeals on this issue.

MOYER, C.J., and DOUGLAS, J., concur in the foregoing dissenting opinion.

_____

Brouse McDowell, Paul A. Rose, Frank E. Quirk and Keven D. Eiber, for appellants Goodyear Tire and Rubber Company, Motor Wheel Corporation, Kelly-Springfield Tire Company, Hose Couplings Manufacturing, Inc., Divested Aerospace Corporation, as successor in interest to Goodyear Aerospace Corporation, Goodyear Farms, Inc., and Brad Ragan, Inc.

Choate, Hall & Stewart, Kathleen A. Burdette and A. Hugh Scott; Baker & Hostetler, L.L.P., Daniel P. Mascaro, Susan E. Thomas and Jordan Berns, for appellees Aetna Casualty & Surety Company and Travelers Indemnity Company.

Hermann, Cahn & Schneider, Anthony J. Hartman and Hugh D. Berkson; Joseph B. Royster; Bollinger, Ruberry & Garvey and Clay Phillips, for appellee Stonewall Insurance Company.

Lord, Bissell & Brook, Daniel I. Schlessinger, Hugh Griffin and Michael P. Comiskey; and Dennis Bartek, for appellees Certain Underwriters at Lloyds, London, and the London Market Company.

Baker, Dublikar, Beck, Wiley & Mathews and James F. Mathews, for appellee Atlanta International Insurance Company.

Buckley King & Bluso and James W. Barnhouse; Cohn & Baughman and Michael J. Baughman, for appellees Century Indemnity Company (individually and as successor to policies issued by Insurance Company of North America), California Union Insurance Company, and U.S. Fire Insurance Company.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., Margaret J. Orbon, Edward M. Kay and Amy R. Paulus; Janik & Dorman, Steven J. Danik and Andrew J. Dorman, for appellees AIU Insurance Company, Birmingham Fire Insurance Company, Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Lexington Insurance Company, and National Union Fire Insurance Company of Pittsburgh, Pa.

Skadden, Arps, Slate, Meagher & Flom and Michael J. Balch; Roderick, Linton, L.L.P., Howard C. Walker, Jr. and Lawrence R. Bach, for appellees General Reinsurance Corporation, Old Republic Insurance Company, and Northstar Reinsurance Corporation, n.k.a. Signet Star Reinsurance Company.

Luce, Forward, Hamilton & Scripps, L.L.P., and Lourdes Slater; Kimball Ann Lane and Craig Brown; Rodgers & Co., L.P.A., and Walter A. Rodgers, for appellee Westport Insurance Company (f.k.a. Puritan Insurance Company).

Rodgers & Co., L.P.A., and Walter A. Rodgers, for appellee Government Employees Insurance Company.

Bates & Carey, Robert J. Bates, Maria G. Enriquez and Monica Sullivan; Ulmer & Berne and David L. Lester, for appellees Executive Risk Indemnity, Inc. (f.k.a. American Excess Insurance Company) and American Re-insurance Company.

Traub, Eglin, Lieberman & Straus, Robert P. Siegel, Meryl R. Lieberman and Stephen D. Straus; Weston, Hurd, Fallon, Paisley & Howley, L.L.P., Gary

Johnson and Joseph M. Saponaro, for appellees Evanston Insurance Company and Northwestern National Insurance Company.

McNeal, Schick, Archibald & Biro Co., L.P.A., Robert D. Archibald and Brian T. Winchester; Tressler, Soderstrom, Maloney & Priess, Michael W. Morrison and Dale Kurth, for appellee Allstate Insurance Company, successor in interest to Northbrook Excess and Surplus Lines Insurance Company.

Merlo, Kanofsky & Brinkmeier, Ltd., Ross D. Roloff and Michael R. Gregg; Roderick, Linton, L.L.P., and Lawrence R. Bach, for appellees Everest Reinsurance Company (f.k.a. Prudential Reinsurance Company) and Gibraltar Casualty Company (n.k.a. Mt. McKinley Insurance Company).

Bollinger, Ruberry & Garvey, Clay Phillips and Dennis Dolan; McMahon DeGulis Hoffmann & Blumenthal and Gregory DeGulis, for appellees International Insurance Company and International Surplus Lines Insurance Company.

Chadbourne & Parke, L.L.P., and Francisco Vazquez, for appellee Bermuda Fire & Marine Insurance Company.

Connelly, Jackson, & Collier, L.L.P., and Steven R. Smith; Covington & Burling and Mitchell F. Dolin, urging reversal for amici curiae Babcox & Wilcox Company, B.F. Goodrich Company, Lincoln Electric Company, Millenium Chemicals, Inc., Norfolk Southern Railway Company, Oglebay Norton Company, Ohio Chemistry Technology Council, Owens Corning, PPG Industries, Inc., and Sherwin-Williams Company.

Goodman Weiss Miller, L.L.P., and Drew A. Carson; Anderson Kill & Olick, P.C., Eugene R. Anderson and Richard P. Lewis; Law Office of Amy Bach and Amy Bach, urging reversal for amicus curiae United Policyholders.

Keener, Doucher, Curley & Patterson and Thomas Joseph Keener, urging affirmance for amicus curiae Insurance Environmental Litigation Association.

1. The other named appellants in this action are Motor Wheel Corporation, Kelly-Springfield Tire Company, Hose Couplings Manufacturing, Inc., Divested Aerospace Corporation, as successor in interest to Goodyear Aerospace Corporation, Goodyear Farms, Inc., and Brad Ragan, Inc.

2. The other appellees in this action are Travelers Indemnity Company, Stonewall Insurance Company, Certain Underwriters at Lloyds, London, London Market Company, Atlanta International Insurance Company, Insurance Company of North America, Century Indemnity Company, Central National Insurance Company of Omaha, California Union Insurance Company, U.S Fire Insurance Company, AIU Insurance Company, Birmingham Fire Insurance Company, Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, General Reinsurance Corporation, Northstar Reinsurance Corporation (n.k.a. Signet Star Reinsurance Company), Westport Insurance Company (f.k.a. Puritan Insurance Company), Government Employees Insurance Company, Executive Risk Indemnity, Inc. (f.k.a. American Excess Insurance Company), American Reinsurance Company, Evanston Insurance Company, Northwestern National Insurance Company, Allstate Insurance Company, as successor in interest to Northbrook Excess and Surplus Lines Insurance Company, Everest Reinsurance Company (f.k.a. Prudential Reinsurance Company), Gibraltar Casualty Company (n.k.a. Mt. McKinley Insurance Company), International Insurance Company, International Surplus Lines Insurance Company, Bermuda Fire & Marine Insurance Company, and Old Republic Insurance Company.

3. The quoted language is taken from a policy issued by Travelers Indemnity Company and is representative of the language used in each of the insurance policies at issue.

4. See, also, *J.H. France Refractories Co. v. Allstate Ins. Co.* (1993), 534 Pa. 29, 626 A.2d 502.

5. The policies at issue used this or similar language.