[Cite as *Cassens Transport Co. v. Bohl*, 2012-Ohio-2248.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

TONY B. BOHL,

    PLAINTIFF-APPELLEE,

    v.                                  CASE NO. 13-11-36

CASSENS TRANSPORT CO.,

    DEFENDANT-APPELLANT,
    -and-

MARSHA P. RYAN, ADMR., OHIO         O P I N I O N
BUREAU OF WORKERS COMP.,

    DEFENDANT-APPELLEE.

Appeal from Seneca County Common Pleas Court
Trial Court No. 10-CV-0631

**Judgment Affirmed**

Date of Decision: May 21. 2012

APPEARANCES:

    *Corey V. Crognale and Meghan M. Majernik* for Appellant

    *Mark B. Weisser* for Appellee, Tony B. Bohl

    *Michael DeWine* for Appellee, Industrial Commission of Ohio

**PRESTON, J.**

{**¶1**} Plaintiff-appellant, Cassens Transport Co. (hereinafter "Cassens"), appeals the judgment of the Seneca County Court of Common Pleas finding that defendant-appellee, Tony B. Bohl (hereinafter "Bohl"), was entitled to participate in the workers' compensation system for the condition of substantial aggravation of preexisting degenerative arthritis of the cervical spine. For the reasons that follow, we affirm.

{**¶2**} On January 7, 2010, Bohl sustained a neck injury while working for Cassens when the chain he was using to secure a motor vehicle to his semi-trailer slipped from the ratchet. (Oct. 11, 2011 Tr. at 78-80, 97-98); (Dr. Heis Depo. at 12, 21). Thereafter, Bohl filed a claim for workers' compensation benefits for cervical strain, which was allowed.

{**¶3**} On August 8, 2010, Bohl filed a motion to amend his workers' compensation claim to include the condition of substantial aggravation of preexisting degenerative arthritis of the cervical spine. (Doc. No. 1, Ex. A). On November 8, 2010, a staff hearing officer granted the additional claim. (*Id.*).

{**¶4**} On November 12, 2010, Cassens filed an appeal, but, on December 1, 2010, the industrial commission refused the appeal pursuant to R.C. 4123.511(E). (*Id.*, Ex. B).

{¶5} On December 17, 2010, Cassens filed a notice of appeal in the Seneca County Court of Common Pleas pursuant to R.C. 4123.512. (Doc. No. 2).

{¶6} On January 3, 2011, Bohl filed a complaint seeking to participate in the workers' compensation system for the additionally allowed claim. (Doc. No. 7).

{¶7} On January 25, 2011, the administrator of the Ohio Bureau of Workers Compensation ("BWC") filed an answer admitting that Bohl was entitled to participate for the additionally allowed claim. (Doc. No. 12). The administrator also filed notice that the BWC would not participate further in the proceedings. (Doc. No. 13). On January 27, 2011, the employer filed an answer denying Bohl's right to participate in the workers' compensation system. (Doc. No. 15).

{¶8} On October 11-12, 2011, a jury trial was held. On the first day of trial, Cassens filed a Civ.R. 50 motion for directed verdict, arguing that Bohl failed to produce objective evidence documenting his alleged substantial aggravation claim as required under R.C. 4123.01(C)(4). (Doc. No. 30). Also on the first day of trial, Bohl filed a motion in limine to exclude evidence that Cassens' Fostoria terminal was scheduled to close shortly after Bohl's injury. (Doc. No. 33). The trial court held Cassens' motion for directed verdict under advisement until after the close of defendant's case, but the trial court granted Bohl's motion in limine at the

beginning of the trial. (Oct. 11, 2011 Tr. at 3, 12). The trial court subsequently overruled the motion for directed verdict. (Oct. 12, 2012 Tr. at 143, 206).

{¶9} The jury rendered a verdict concluding that Bohl was entitled to participate in the workers' compensation system for the condition of substantial aggravation of preexisting degenerative arthritis of the cervical spine. (Doc. No. 34). On November 2, 2011, the trial court entered judgment accordingly. (Doc. No. 35).

{¶10} On November 10, 2011, Cassens filed a Civ.R. 59(A) motion for new trial. (Doc. No. 36). On December 1, 2011, the trial court overruled the motion. (Doc. No. 39).

{¶11} On December 12, 2011, Cassens filed a notice of appeal. (Doc. No. 40). Cassens now appeals raising three assignments of error for our review.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED IN DENYING APPELLANT CASSENS' MOTION FOR A DIRECTED VERDICT BECAUSE THE JUDGMENT IS NOT SUBSTANTIATED BY THE WEIGHT OF THE EVIDENCE.**

{¶12} In its first assignment of error, Cassens argues that the trial court erred by denying its motion for a directed verdict since Bohl failed to present objective diagnostic findings, objective clinical findings, or objective test results evidencing his substantial aggravation claim as required by R.C. 4123.01(C)(4).

{¶13} A trial court shall sustain a party's motion for directed verdict if, after construing the evidence most strongly in favor of the party against whom the motion is directed, reasonable minds could come to but one conclusion upon the evidence submitted, and that conclusion is adverse to the party against whom the motion is directed. Civ.R. 50(A)(4).

{¶14} A motion for a directed verdict presents a question of law. *Good Year Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 4, citing *O'Day v. Webb*, 29 Ohio St.2d 215 (1972), paragraph three of the syllabus. As such, we review a trial court's decision to grant or deny the motion de novo. *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 76 Ohio St.3d 521, 523 (1996).

{¶15} A claimant must establish an injury to participate in Ohio's workers' compensation system. *Schell v. Globe Trucking, Inc.*, 48 Ohio St.3d 1, 2 (1990); *Pflanz v. Pilkington LOF*, 1st Dist. No. C–100547, 2011-Ohio-2670, ¶ 11; R.C. 4123.54. "'Injury' includes any injury, whether caused by external accidental means or accidental in character and result, received in the course of, and arising out of, the injured employee's employment." R.C. 4123.01(C).

{¶16} As early as 1936, the Ohio Supreme Court concluded that the aggravation of a preexisting condition was a compensable work-related injury. *Ackerman v. Indus. Comm.*, 131 Ohio St. 371 (1936), citing *Weaver v. Indus.*

*Comm.*, 125 Ohio St. 465 (1932). More recently, the Ohio Supreme Court held that an aggravation of a preexisting condition did *not* have to be "substantial" in order to be compensable. *Schell*, 48 Ohio St.3d 1, at syllabus. The Court in *Schell* reasoned that:

> R.C. 4123.01(C) does not require that an injury be of any particular magnitude in order for a claimant to participate in the fund with respect to any disability resulting from the injury. To require that an injury, in the form of an aggravation of a pre-existing condition, must be of a specified magnitude would work a change in the statutory scheme that would best be left to the legislature. *Id*. at 3.

{¶17} In response to *Schell*, supra, the General Assembly enacted Am. Sub. S.B. No. 7 (eff. 6-30-06), which added subdivision (C)(4) to R.C. 4123.01 and division (G) to R.C. 4123.54. *Smith v. Lucas Cty.*, 6th Dist. No. L-10-1200, 2011-Ohio-1548, ¶ 17. Subdivision (C)(4) excludes from R.C. 4123.01's definition of injury:

> [a] condition that pre-existed an injury unless that pre-existing condition is substantially aggravated by the injury. Such a substantial aggravation must be documented by objective diagnostic findings, objective clinical findings, or objective test results. Subjective complaints may be evidence of such a substantial

-6-

aggravation. However, subjective complaints without objective diagnostic findings, objective clinical findings, or objective test results are insufficient to substantiate a substantial aggravation. R.C. 4123.01(C)(4). (Am. Sub. S.B. No. 7, eff. 6-30-06).

Division (G) of R.C. 4123.54 provides:

[i]f a condition that pre-existed an injury is substantially aggravated by the injury, and that substantial aggravation is documented by objective diagnostic findings, objective clinical findings, or objective test results, no compensation or benefits are payable because of the pre-existing condition once that condition has returned to a level that would have existed without the injury. R.C. 4123.54(G).

{¶18} The Court of Appeals for the First District has recently concluded that "* * * [an] aggravation of a preexisting condition must be substantial both in the sense of being considerable and in the sense of being firmly established through the presentation of objective evidence" to constitute an injury under R.C. 4123.01(C)(4). *Pflanz*, 2011-Ohio-2670, at ¶ 18.

{¶19} With these rules in mind, we now turn to the evidence presented at trial. John Elliot testified that he has been the manager of the Cassens Fostoria terminal since 2004. (Oct. 11, 2011 Tr. at 66). Elliot testified that Ford vehicles were railed into the Fostoria terminal, where 40 truck drivers loaded them onto

trucks and drove them to auto dealers. (*Id*. at 67, 75). Elliot testified that the drivers were laid off in January 2010 when Cassens closed the Fostoria terminal, but 18 of the 40 drivers were rehired in Lordstown, Ohio and a few drivers retired. (*Id*.); (*Id*. at 78, 82-83). Elliot testified that Bohl worked as a truck driver at the Fostoria terminal since 2006, and Bohl was a good, reliable, and honest employee. (*Id*. at 67-68). Elliot testified that, on January 7, 2010, the dock supervisor informed him that Bohl injured his neck, so Elliot told him that Bohl had to fill out an injury report (P's Ex. 1). (*Id*. at 68-69). Elliot further testified that Bohl told him he injured his neck when he was tying down the last unit on the truck. (*Id*. at 69). Elliot testified that he did not have any reason to disbelieve Bohl. (*Id*.). Elliot further testified that an employee, Bob Crawford, told him that he witnessed Bohl get injured in the way Bohl described. (*Id*. at 71-72). Elliot testified that every Cassens' employee is part of the Teamsters Union. (*Id*. at 76). He testified that, in December 2009, they first learned that the Fostoria terminal was going to close on January 10, 2010, because Ford's contract with the railroad company that passed through the Fostoria terminal was ending. (*Id*. at 77).

{¶20} Bohl testified that, on January 7, 2010, he was ratcheting down a Ford Escape on the back bottom of the truck trailer when the chain kicked off the idler and re-caught causing him to feel a snap in his neck and to stand there "paralyzed." (*Id*. at 97-98). Bohl testified that Bobby Crawford, who was loading

his truck next to him when he was injured, heard the chain slip and came over to ask him if he was alright. (*Id*. at 99). Bohl testified that the yardman, Jim, took him to the terminal office to meet with Elliot and fill out paperwork. (*Id*. at 99-100). Bohl testified that, after he filled out the paperwork, Elliot called Columbus, and told him that his claim was denied. (*Id*. at 101). According to Bohl, Elliot told him that he was not going to the clinic, but he was free to go seek medical attention on his own. (*Id*.). Bohl testified that he drove himself to the hospital because he was feeling sharp pains in his neck, he had numbness in his left arm, and he could not move his head. (*Id*. at 102). Bohl testified that the hospital took x-rays, and gave him some muscle relaxers. (*Id*. at 103). He testified that he saw his back surgeon, Dr. Kramer, the next day since he already had a regular follow-up appointment from his previous lower back surgery. (*Id*. at 103). Bohl testified that Dr. Kramer referred him to Dr. Heis, who has been his primary doctor for his neck injury since March 2010. (*Id*. at 104). According to Bohl, Dr. Heis initially prescribed physical therapy, but he was still experiencing problems with his range of motion. (*Id*. at 104-105). Bohl testified that he did not recall reporting some neck pain to his family doctor, Dr. Donohoo, when he previously slipped and fell at work. (*Id*. at 107). Bohl testified that he did not miss any work due to his neck pain; he was not referred to another doctor; nor was an x-ray taken; but, he was given some medication. (*Id*.). Concerning his present neck injury, Bohl testified

that he was given four trigger-point injections into the spine to block the nerve roots. (*Id*. at 109). Bohl testified that the second root blocker did give him some temporary relief from headaches but he still is experiencing neck pain and a reduced range of motion. (*Id*. at 110). Bohl also testified that, since his neck injury, he has been unable to golf, ride a motorcycle, or work on cars like he used to do before the injury. (*Id*. at 93-94, 113-114).

{**¶21**} On cross-examination, Bohl testified that he had a previous back injury while he was working for another trucking company, E & L, and missed around three years of work. (*Id*. at 114). He testified that his medical bills were paid through workers' compensation, and he received temporary compensation through workers' compensation during those three years. (*Id*. at 114-115). Bohl testified that he had 24½ years of seniority working for companies affiliated with the Teamsters Union, which counted toward his retirement. (*Id*. at 115-116). Bohl admitted telling Dr. Kramer during his February 29, 2000 check-up to keep him healthy for a few more years so he could retire with 30 years and get the full compliments of benefits through Teamsters. (*Id*. at 117-118). Bohl testified that he drove himself to the hospital even though he had a difficult time driving the vehicle with numbness in his left arm. (*Id*. at 120). Bohl testified that the emergency room physician must have made an error in his report, because the report indicated that the patient denied numbness in his extremities, i.e. arms and

legs. (*Id*. at 122). Bohl also admitted that the emergency room physician noted equal motor strength in the upper extremities and no weakness or loss of sensation. (*Id*. at 122-123). Bohl admitted that he mistakenly denied having previous neck pain during his deposition, though he testified that he forgot about the incident. (*Id*. at 124). Bohl testified that he had surgery on his left shoulder for injuries he sustained as a result of a gunshot wound. (*Id*. at 126). Bohl testified that two bullet fragments are still lodged behind his left shoulder blade. (*Id*.). Bohl testified that he did not recall his reports of neck pain to Dr. Donohoo on February 19, 2001, May 19, 2003, June 6, 2003, May 26, 2007, and January 2, 2009. (*Id*. at 128-130). Bohl did not recall that Dr. Donohoo diagnosed him with cervical strain in January 2009. (*Id*. at 130).

{¶22} On re-direct, Bohl testified that, regardless of the emergency room reports, he reported to Dr. Kramer on January 8, 2010, the day after the injury, that he felt pain down his arm. (*Id*. at 131-132). He further testified that Dr. Kramer noted that his injury was "degenerative in nature and could've been aggravated by his job when he was tightening the chain on the truck transporting automobiles." (*Id*. at 132). Bohl also testified that, when he had neck pains in the past, he was never given an x-ray or MRI, referred to another doctor, given injections, or placed on work restrictions. (*Id*. at 133).

{¶23} Dr. Stephen Dale Heis ("Dr. Heis") testified that he specializes in physical medicine and rehabilitation, and he treats musculoskeletal injuries such as neck pain. (Heis Depo. at 5-6). Dr. Heis testified that he first saw Bohl on March 15, 2010 after Dr. Kramer referred Bohl to his office. (*Id.* at 9). Dr. Heis testified that, after viewing Bohl's MRI, Dr. Kramer decided that Bohl did not need surgery but more conservative treatment, including medication and physical therapy. (*Id.* at 10). Dr. Heis testified that, when he initially saw Bohl, Bohl complained of pain in the back of his neck going toward his left shoulder, which was worse when he moved his neck to the right or left and when he lifted his left arm above his shoulder. (*Id.* at 10-11). Bohl indicated that he was injured on January 7, 2010, and that his neck felt better when he lied down and took pressure off it. (*Id.* at 11). Dr. Heis testified that he did a physical examination of Bohl, which revealed "some decreased rotation of his neck, ability to move his neck back and forth was decreased." (*Id.*). Dr. Heis further testified that Bohl had pain when he put pressure on the muscles on the left side and the back side of Bohl's neck. (*Id.*). Dr. Heis testified that he determined that the pain was caused from a muscle strain, so he ordered Bohl medication and physical therapy. (*Id.*). Dr. Heis testified that he performed "trigger point injections," which are small doses of cortisone injected into the muscle at the point where the patient feels pain upon pressure, to reduce inflammation of the muscles. (*Id.* at 14). Dr. Heis testified that, in June 2010, he

referred Bohl to Dr. Atluri for cervical nerve root blocks. (*Id.* at 15). Dr. Heis explained that cervical epidural injections contain cortisone for inflammation, like trigger point injections, but epidural injections are made deep into the spine, near the spinal cord. (*Id.*). Dr. Heis testified that these injections sometimes help patients with spinal changes due to arthritis. (*Id.*).

{¶24} Dr. Heis testified that, in August 2010, he requested that Bohl's workers' compensation claim be amended to include substantial aggravation of cervical degenerative disc disease. (*Id.* at 16). Dr. Heis explained that degenerative disc disease is caused by normal aging of the spine due to body movement over the years. (*Id.*); (*Id.* at 25-26). He testified that discs become thinner, begin to bulge out posteriorly in the back of the disc, and bone spurs start developing in patients with the disease. (*Id.* at 17). Dr. Heis concluded that Bohl had the disease after viewing his MRI and x-rays. (*Id.* at 17-18). Dr. Heis testified that, during his August 8, 2010 visit, he asked Bohl if he was able to do his work without any neck pain prior to the work injury, and Bohl indicated "yes". (*Id.* at 18-19). Dr. Heis testified that, based upon his physical examination of Bohl, Bohl's MRI and medical records, and his own clinical observations, it was his opinion that Bohl sustained a substantial aggravation of cervical disc disease as a result of his workplace injury. (*Id.* at 19). Dr. Heis explained that he reached this opinion because Bohl did not heal after several months of treatment. (*Id.* at 19-20). Dr.

Heis testified that his diagnosis was consistent with other types of neck injuries where the neck of the patient with degenerative arthritis is snapped back and forth. (*Id.* at 21). Dr. Heis testified that he last saw Bohl on August 18, 2011, and Bohl was still complaining of neck pain in spite of the months of treatment, so he referred him back to Dr. Kramer for possible surgery. (*Id.* at 23-24).

{¶25} On cross-examination, Dr. Heis testified that cervical spondylosis is a general term for age-related wear and tear, which can contribute to the development of osteoarthritis or degenerative disc disease. (*Id.* at 26). Dr. Heis testified that a patient suffering from cervical spondylosis can experience a stiff or painful neck, as well as pain in the shoulders, arms, and chest. (*Id.* at 27). He testified that Bohl's bone spurs on C4, C5, C6, and C7 took years to develop and were there before the January 2010 injury. (*Id.* at 29-30). Dr. Heis testified that MRI findings and clinical examinations are objective findings, but, with respect to range of motion and pain, Dr. Heis testified "* * * it depends on how far they can turn their neck and how hard they are pushing themselves, and how much pain they're having * * *." (*Id.* at 32-33). Dr. Heis testified that Bohl had normal strength in his upper extremities and no focal weakness was detected upon examination. (*Id.* at 33). Dr. Heis classified these findings as objective. (*Id.* at 33-34). Dr. Heis testified that he initially diagnosed Bohl with muscle strain, and he noted that Bohl's sensation was good. (*Id.* at 35). Dr. Heis testified that, when he

examined Bohl, he was not aware of Bohl's prior neck complaints in 2001, 2002, and 2009. (*Id*. at 37-40). On re-direct, Dr. Heis testified that his opinion that Bohl suffered a substantial aggravation of cervical disc disease is based upon Bohl's clinical presentation, medical history, the course of treatment, and his findings. (*Id*. at 43-44).

**{¶26}** Thereafter, defendant's exhibits one through seven were admitted without objection. (Oct. 12, 2011 Tr. at 141-142). Cassens made a motion for a directed verdict, arguing that Dr. Heis made no reference to objective findings supporting his opinion that Bohl suffered a substantial aggravation of degenerative arthritis of the cervical spine. (*Id*. at 142-143). The trial court overruled the motion. (*Id*. at 143). The defense, then, presented the depositional testimony of its expert witness, Dr. Michael Rozen. (*Id*. at 145).

**{¶27}** Dr. Michael Rozen testified that degenerative arthritis and cervical spondylosis are synonymous terms, which refer to a condition that occurs over a prolonged period of time from wear and tear and aging of the cervical spine. (Rozen Depo. at 8-9). Some patients are asymptomatic, while other experience pain, decreased range of motion, or numbness and tingling, according to Dr. Rozen. (*Id*. at 9, 13). Dr. Rozen testified that pain and tenderness are subjective, not objective, findings. (*Id*. at 15). He further testified that reflexes can be objective findings for purposes of establishing a substantial aggravation if, and

only if, there are measurements before and after the injury. (*Id*. at 15-16). Dr. Rozen testified that he examined Bohl on March 16, 2010, and Bohl complained of sharp neck pain on the left side of his neck, with pain that went down to his left forearm. (*Id*. at 18). Bohl indicated that his neck pain increased when he moved his head to the left and when he sat down to read papers, and he complained of pain on the left side of his head and his left arm going numb, according to Dr. Rozen. (*Id*. at 19). Dr. Rozen testified that Bohl indicated that Dr. Kramer performed lower back surgeries on him in 1995, 1996, and 1999, but Bohl denied prior neck problems. (*Id*.). Dr. Rozen testified that he performed a physical examination of Bohl, which revealed normal reflexes in both of his arms and normal sensation. (*Id*. at 21). He testified that he performed a Spurling test to determine whether any nerves were being compressed by spinal bones or disc, and the test results were normal. (*Id*. at 21-22). Dr. Rozen testified that, after conducting his physical examination of Bohl, he was unable to find any objective finding indicative of a substantial aggravation of Bohl's degenerative condition. (*Id*. at 22, 27). Dr. Rozen testified that he reviewed Bohl's x-ray and MRI, which indicated that Bohl has degenerative changes throughout his thoracic and cervical spine. (*Id*. at 23). Dr. Rozen testified that there was no evidence of any acute injury to Bohl's cervical spine, only evidence of longstanding bone spurs. (*Id*. at 26). Dr. Rozen testified that he concluded that Bohl suffered from a cervical strain,

which is a soft-tissue injury that generally resolves in a relatively short period of time. (*Id.* at 27).

{¶28} When questioned about locating any objective findings in Dr. Heis' March 15, 2010 report, Dr. Rozen testified that "[t]he only objective finding would be that Mr. Bohl did not have a normal range of motion of his cervical spine; that would be consistent with a diagnosis of degenerative arthritis." (*Id.* at 28-29). Dr. Rozen testified Dr. Heis' findings that Bohl has normal strength, no focal weaknesses, and intact sensation, are normal objective findings. (*Id.* at 29). He further testified that Dr. Heis' original diagnosis was that Bohl suffered a muscle strain. (*Id.*). Dr. Rozen testified that Bohl is likely still having pain from his arthritis, but Bohl has arthritis throughout his entire spine and there is no way to determine the precise location of the pain. (*Id.* at 31-32).

{¶29} On cross-examination, Dr. Rozen testified that he owns a company called Independent Medical Specialist Evaluations, which started in 2006, and he last practiced medicine in 1996. (*Id.* at 33). He testified that his company did around 760 examinations last year for various entities like municipalities, the Ohio Attorney General's Office, hospitals, and insurance companies. (*Id.* at 34-35). Dr. Rozen estimated that two-thirds of the examinations were on behalf of employers or their insurers in workers' compensation cases. (*Id.* at 35). Dr. Rozen agreed that Bohl suffered an injury to his neck in January 2010. (*Id.* at 38). Dr. Rozen also

agreed that the x-rays and MRIs indicate that Bohl has cervical arthritis. (*Id.* at 41). Dr. Rozen testified that "there is no evidence of any acute injury to [Bohl's] cervical spine * * * [t]here's no soft tissue swelling. There's no bone marrow edema. There's no bleeding in the area." (*Id.* at 43). Because of that, there is no way to state that the neck injury produced a substantial aggravation to a reasonable degree of medical certainty, according to Dr. Rozen. (*Id.*). Dr. Rozen further testified that if Bohl had a significant injury to his cervical spine, an MRI would show lingering effects of that injury even if the MRI was taken about a month after the injury, like the MRI in this case. (*Id.*). Dr. Rozen testified that he has testified in other cases that the claimant suffered a substantial aggravation of an existing condition, and he would not hesitate to testify that Bohl had a substantial aggravation claim if he had found objective evidence supporting that position. (*Id.* at 44, 46). Dr. Rozen further testified that, given Bohl's history of back issues and well-documented history of degenerative arthritis throughout his spine, he would be surprised if Bohl's range of motion prior to the incident was normal. (*Id.* at 50-51). Dr. Rozen explained that he did not have proof that Bohl's range of motion was abnormal prior to the accident since he did not have medical records from other physicians that Bohl might have seen for treatment. (*Id.* at 51-52).

**{¶30}** Thereafter, the trial court admitted defense exhibits A, B, C, E, F, and G without objection. (Oct. 12, 2011 Tr. at 146). Cassens renewed its motion

for directed verdict, which was overruled. (*Id*. at 206). The matter was submitted to the jury, which rendered a verdict in favor of Bohl. (Doc. No. 34).

**{¶31}** After reviewing the evidence in a light most favorable to Bohl as the non-movant, we cannot conclude that the trial court erred by denying the motion for directed verdict. While we do not agree with the trial court's conclusion that Dr. Heis' expert opinion that Bohl suffered from a substantial aggravation, alone, was sufficient to overcome the motion for directed verdict, the evidence taken as a whole and viewed in a light most favorable to Bohl was sufficient to overcome the motion. (Oct. 12, 2011 Tr. at 143) (THE COURT: "I have to rule on it. He said -- I don't know about 'magic words,' but [Dr. Heis'] opinion was that it was substantial. So in any event, [the motion] is overruled."). When Dr. Heis was specifically asked what formed the basis of his opinion that Bohl suffered a substantial aggravation of cervical degenerative disc disease, he testified:

> Well, normally with the type of jerking injury to the neck you would expect the muscle to be pulled or strained and that normally would heal up on its own anywhere from six to 12 weeks.
>
> With conservative treatment and medication, and a lot of times these muscle injuries will heal up without any special treatment, studies have shown, and it doesn't matter whether you go to a chiropractor or go to a doctor like myself or don't get any treatment,

a lot of times these muscle strains will heal up eventually. His did not heal up, and became initially worse. He stated the therapy made his pain worse, and the fact that it had been so long, he was still having neck pain complaints in August when his injury occurred in January, it was my opinion that he had aggravation of his arthritis that was underlying the muscles in the neck from the jerking injury, and that's what caused his pain to continue at that time. (Heis Depo. at 19-20).

{¶32} As Cassens points out, Dr. Heis' testimony fails to reference "objective diagnostic findings, objective clinical findings, or objective test results" as required under R.C. 4123.01(C)(4). Nevertheless, Dr. Heis' testimony must be read in light of his medical reports, which were admitted into evidence. On March 15, 2010, Bohl's initial visit about two months after the injury, Dr. Heis made the following notation: "[r]ange of motion of the cervical spine reveals rotation possible to 75° to the right, and only 40° to the left, with full flexion and 30° of cervical extension." (P's Ex. 4); (D's Ex. G). On August 9, 2010, after several months of treatment with medication, physical therapy, and cervical nerve root blocks, Dr. Heis made the following notation concerning Bohl's range of motion: "exam today reveals rotation of the neck to the right and left at 45°, with 20° of extension and only 30° of flexion noted today." (*Id.*); (*Id.*). Consequently, the

record contained objective clinical findings demonstrating that Bohl's range of motion decreased months after the initial injury despite medical treatment. Viewing this evidence, along with Dr. Heis' testimony and Bohl's testimony, a rational trier of fact could have concluded that Bohl suffered a substantial aggravation of preexisting degenerative arthritis of the cervical spine. As such, the trial court did not err by denying Cassens' motion for a directed verdict.

{¶33} Cassens' first assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ABUSED ITS DISCRETION AND, THEREBY COMMITTED REVERSIBLE ERROR, WHEN IT PROHIBITED CASSENS FROM INTRODUCING PERMISSIBLE IMPEACHMENT EVIDENCE OF BOHL'S POTENTIAL BIAS, PREJUDICE, OR MOTIVE.**

{¶34} In its second assignment of error, Cassens argues that the trial court abused its discretion by excluding evidence of Bohl's motive to misrepresent his injury, which was admissible under Evid.R. 616(A). Specifically, Cassens argues that Bohl had a motive to misrepresent his injury since he knew he would be laid off when Cassens closed the Fostoria terminal on January 10, 2010. Cassens points out that Bohl had 24½ years of service, and Bohl could accrue years of service while collecting workers' compensation but he could not accrue years of service while laid off. Cassens argues that Bohl, therefore, had a motive to misrepresent his injury so he could accrue time and retire with 25 years of service.

{¶35} "The admission of evidence is generally within the sound discretion of the trial court, and a reviewing court may reverse only upon the showing of an abuse of that discretion." *Peters v. Ohio State Lottery Comm.*, 63 Ohio St.3d 296, 299 (1992). An abuse of discretion constitutes more than an error of judgment; rather, it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Id*.

{¶36} Evid.R. 616(A) provides that "[b]ias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence."

{¶37} The trial court did not abuse its discretion by excluding evidence of Bohl's motive to misrepresent under the circumstances of this case. Dr. Rozen, Cassens' medical expert, agreed with Dr. Heis, Bohl's physician, that Bohl suffered a neck injury on January 7, 2010. (Rozen Depo. at 38). Bohl testified that he wanted to retire with 30 years of service to receive full benefits. (Oct. 11, 2011 Tr. at 117). In light of this evidence, it was reasonable for the trial court to conclude that evidence of Bohl's possible motive to misrepresent, while relevant and admissible under Evid.R. 616(A), was, nevertheless, unfairly prejudicial and misleading and excluded from evidence under Evid.R. 403(A).

{¶38} *Even if* the trial court erred by excluding the evidence as Cassens argues, we find any error harmless in this case since the jury heard evidence from which they could have drawn an inference of Bohl's alleged motive to misrepresent. Civ.R. 61. Elliot, the terminal manager, testified that, in December 2009, the workers learned that they would be laid off since the Fostoria terminal was closing on January 10, 2010—just a few days after Bohl's injury. (Oct. 11, 2011 Tr. at 67, 77-78). Bohl even acknowledged at trial during his direct testimony that, prior to his injury, he knew the terminal was going to close. (*Id*. at 96). Bohl was also cross-examined about his statements to his doctors to keep him healthy for a few more years so he could retire with full benefits. (*Id*. at 115-119). In light of this evidence being presented to the jury, we are not persuaded that Cassens' substantial rights were affected by the trial court's evidentiary ruling.

{¶39} Cassens' second assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING CASSENS' MOTION FOR A NEW TRIAL.**

{¶40} In its third assignment of error, Cassens argues that the trial court erred by denying its Civ.R. 59(A) motion for a new trial. Specifically, Cassens argues that: (1) the judgment rendered was not sustained by the weight of the evidence and is contrary to law; and (2) the trial court abused its discretion by

prohibiting it from introducing impeachment evidence, thereby preventing it from having a fair trial.

**{¶41}** Civ.R. 59(A) provides several grounds for which a trial court may grant a new trial, including the following grounds applicable to this appeal:

(1) Irregularity in the proceedings of the court * * * or any order of the court * * * or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;

* * *

(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;

* * *

(7) The judgment is contrary to law;

**{¶42}** A trial court's decision of whether to grant a motion for a new trial premised upon Civ.R. 59(A)(1) or (6) is reviewed for an abuse of discretion. *Brown v. Senor Gringo's, Inc.*, 3d Dist. No. 4-09-18, 2010-Ohio-985, ¶ 41, citing *Lewis v. Nease*, 4th Dist. No. 05CA3025, 2006-Ohio-4362, ¶ 73; *Ward v. Geiger*, 3d Dist. No. 14-05-14, 2006-Ohio-6853, ¶ 56; *Mannion v. Sandel*, 91 Ohio St.3d 318, 321 (2001). A trial court's ruling on a motion for a new trial premised upon

Civ.R. 59(A)(7), however, presents a question of law reviewed de novo. *Brown*, 2010-Ohio-985, at ¶ 42, citing *Lewis*, 2006-Ohio-4362, at ¶ 76.

**{¶43}** We have already concluded in the second assignment of error that the trial court did not err by excluding the impeachment evidence and, regardless, any potential error was rendered harmless in light of the evidence presented in this case. Therefore, we cannot conclude that the trial court abused its discretion by denying Cassens' motion for a new trial under Civ.R. 59(A)(1) based upon this same alleged evidentiary error. Neither can we conclude that the trial court's judgment was erroneous as a matter of law for purposes of Civ.R. 59(A)(7) when the record contained objective clinical findings in support of Bohl's substantial aggravation claim as required by R.C. 4123.01(C)(4). Finally, we cannot conclude that the trial court abused its discretion by denying Cassens' motion for a new trial under Civ.R. 59(A)(6), because the record contained competent, credible evidence supporting the jury's verdict. *Striff v. Luke Md. Practitioners, Inc.*, 3d Dist. No. 1-10-15, 2010-Ohio-6261, ¶ 72, citing *Verbon v. Pennese*, 7 Ohio App.3d 182, 183 (6th Dist.1982); *Ball v. M.R. Philpot Masonry Co., Inc.*, 3d Dist. No. 17-90-4, at *2 (Apr. 10, 1991).

**{¶44}** Cassens' third assignment of error is, therefore, overruled.

{¶45} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J., concurs.**

**/jlr**


**ROGERS, J., DISSENTS.**

{¶45} I respectfully dissent from the opinion of the majority as to the first assignment of error. I would find that the evidence submitted by the Appellee did not fulfill the statutory requirement that there be objective evidence of a substantial aggravation of a pre-existing condition. The most that can be said is that Appellee had a limited range of motion which is itself subject to distortion by the person being tested and requires a subjective interpretation by the person performing the test. I would, therefore, sustain the first assignment of error and find the second and third assignments of error to be moot.