**[Cite as *Tanner v. Carmichael*, 2025-Ohio-4501.]**

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| | | |
|---|---|---|
| DERRYL TANNER | | C.A. No.    24CA012167 |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| EBONY CARMICHAEL, et al. | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE No.    19JG56574 |

## DECISION AND JOURNAL ENTRY

Dated: September 29, 2025

STEVENSON, Presiding Judge.

{¶1}    Appellant Ebony Carmichael ("Mother") appeals from the judgment of the Lorain County Court of Common Pleas, Juvenile Division, that designated Appellee Terrence Williams ("Williams") the residential parent for school purposes in a shared parenting plan allocating parental rights and responsibilities as to their daughter B.C.  For the reasons set forth below, this Court affirms.

I.

{¶2}    In March 2019 Derryl Tanner ("Tanner") filed a complaint against Mother for custody of three minor children; two boys (both with the initials "D.T.") and B.C.  Subsequently, Mother also filed a complaint for custody of the three children.  At the time, Tanner believed he was the biological father of all three children.  However, after DNA testing, it was determined that Tanner is the father of the two boys, and Williams is the father of B.C.  Upon receiving the DNA test results, Williams filed a motion to intervene and for custody of B.C.  Tanner and Mother

reached an agreement regarding the two boys and entered into a shared parenting plan in March 2021.

{¶3} Mother, Williams, and Tanner were unable to resolve their differences regarding custody of B.C. The trial court initially granted temporary custody of B.C. to Mother. At the time, Mother was living in Washington, D.C. ("D.C."), having made what the court characterized as an "unapproved relocation . . . in the middle of the litigation [that] was not mandatory. . ." Mother grew up in D.C. and still had family there. Williams was granted visitation for five weeks in the summer. The court granted Tanner two weeks of visitation with B.C. during Williams' five weeks. Upon Williams' motion, the court appointed a Guardian ad litem ("GAL"). Between B.C.'s birth in 2014 and the commencement of the litigation, Mother went back and forth several times between living in Northeast Ohio and D.C.

{¶4} The trial regarding custody of B.C. began in July 2021 and ensued for eight days over a period of two years. Tanner, Williams, Mother, the GAL, Maternal Grandmother Glenda Carmichael ("MGM"), and Tanner's mother Deborah Kimbro testified. MGM hired an attorney to represent B.C., Antonio Nicholson. The court granted Mr. Nicholson permission to represent B.C. and participate in the case provided that his meetings with B.C. did not include MGM.

{¶5} During his opening statement, Tanner's counsel announced that Tanner was no longer seeking custody of B.C. as he did not believe Williams and Mother were unfit parents and instead was requesting visitation only. However, he reserved the issue of custody should the court find the parents unfit. Tanner considered himself the emotional father of B.C. because B.C. had resided primarily with Tanner/his family, Mother, and the two boys for most of her life since birth.

{¶6} On the first day of trial, the court conducted an in-camera interview of B.C. "[d]ue to [the] GAL having difficulties obtaining information regarding the children's schooling and

Mother's alleged role in same[.]" Following "concerning testimony" by the GAL on day three of trial, the court granted interim temporary custody of B.C. to Williams. Mother and Tanner were granted visitation.

{¶7} As for the "concerning testimony" by the GAL, she testified that it was agreed the children would finish the 2020-2021 school year online in the North Ridgeville, Ohio school district due to their relocation to D.C. pursuant to the court's order granting Mother interim custody. However, the North Ridgeville schools did not permit the children to finish the year and disenrolled them on March 19, 2021, because the schools "did not want to deal with [Mother]" anymore. In addition, upon the children's relocation to D.C., it took Mother several weeks to enroll the children in school, and when she did, it was not one of the schools that Mother and the GAL discussed. Also, as of the date of the GAL's testimony on July 9, 2021, which was several months after the children's relocation, Mother still had not enrolled the children in counseling as agreed. In the GAL's opinion, these delays in arranging for schooling and counseling reflected that Mother did not treat the children as a priority.

{¶8} The GAL further testified that although she tried for weeks to verify the children's school enrollment, sending frequent emails and leaving voicemails with various school officials, she got no response except from Mother who insisted that all communication from the school go through her and that the GAL send her a list of questions to pose to the school. All documents from the D.C. school were received from Mother. The GAL testified that she had never encountered this arrangement in all her years of GAL work. By contrast, the North Ridgeville schools responded immediately to her requests for records. The letters that the GAL ultimately received from the D.C. schools were signed by the business manager or logistics and strategies director instead of the principal and reflected two different enrollment dates. The GAL

characterized both Mother and the school as uncooperative and questioned whether the children were actually enrolled in school. Although the GAL eventually received the children's grades, they were later changed in a subsequent email and reflected that their academic performance had declined from their grades at North Ridgeville. The GAL also testified that B.C. displayed anxiety while living with Mother in D.C. because of the tension in Mother's home, but was happy when she was with Williams. The GAL recommended that B.C. be placed in Williams' custody.

{¶9} In August 2022, during B.C.'s summer visit with Mother, Mother moved for emergency temporary custody of B.C., alleging that Williams was neglecting her. The trial court denied the motion and ordered Mother to return B.C. to Ohio immediately. The court learned from Mother's motion that she had taken B.C. to her own counselor in D.C. seven times in two and a half weeks in violation of the court's interim order. B.C. was already in counseling in Ohio with an established counselor arranged by Williams.

{¶10} At the conclusion of the trial on March 29, 2023, the court ordered the parties to submit closing arguments and proposed judgment entries/shared parenting plans and took the matter under advisement. The parties each submitted their respective shared parenting plans and proposed judgment entries. The only document admitted into evidence was B.C.'s birth certificate. The court conducted a second in-camera interview of B.C. in June 2023.

{¶11} The court issued an interim order in December 2023 directing that Mother was to exercise her parenting time only in Northeast Ohio and was not to remove B.C. from Ohio "for any length of time." Mother was further ordered not to seek counseling or non-emergency medical treatment for B.C. without Williams' consent. In February 2022, Mother had removed B.C. from Ohio during a visit with MGM and took her to D.C. without Williams' knowledge. As previously noted, in August 2022, Mother violated the court's order by taking B.C. to a counselor in D.C. In

February 2023, Mother took B.C. to the emergency room without first notifying Williams. On each of those occasions, Williams was B.C.'s interim primary custodian. Mother was also ordered to refrain from calling the police on Williams for non-emergency frivolous reasons as she had done several times during the pendency of the case.

{¶12} In September 2024, the trial court issued its final judgment entry. The trial court ordered that it was in B.C.'s best interest that a shared parenting plan be established between Mother and Williams; that Williams be designated B.C.'s residential parent for school purposes; that Mother have parenting time during the summer, all three-day weekends, and Christmas and spring breaks; and that Tanner have court-ordered parenting time during Mother's parenting time. Although the court declined to issue a specific schedule for Tanner's time with B.C., it stated that the "intent [was] that Father Tanner have time with the child" and "[i]f Mother does not allow said time with Father Tanner and [B.C.] and the two other half-siblings, Father Tanner may petition this Court for a schedule." The court further decided that it was in B.C.'s best interest that no order for child support be issued because both Mother and Williams testified that they could provide for B.C. without financial assistance from the other.

{¶13} In its decision, the court made numerous findings, including specific findings regarding the R.C. 3109.04(F)(1) custody factors. The court highlighted in bold its finding that "**[i]n essence, Mother's conduct rose to a level of duplicity and manipulation that not only shocked this Court's conscience but also is extremely detrimental to the child in what she is learning from her Mother.**" (Emphasis in original.)

{¶14} Mother timely appealed and asserts three assignments of error for our review. Mother's second and third assignments of error will be addressed out of order for ease of analysis.

II.

**FIRST ASSIGNMENT OF ERROR**:

**R.C. 3109.04(F)(1) IS UNCONSTITUTIONAL AS APPLIED TO [MOTHER] UNDER THE PRIVILEGES AND IMMUNITIES CLAUSE OF THE UNITED STATES CONSTITUTION.**

{¶15}   Here, Mother argues that the best interest factor set forth in R.C. 3109.04(F)(1)(j) (Whether either parent has established a residence, or is planning to establish a residence, outside this state) is unconstitutional as applied to her because it treats her status as a non-Ohio resident as though "a parent that lives in Ohio is better positioned to serve a child's best interests than a parent that does not live in Ohio."  She maintains that this provision discriminates against non-Ohio resident parents and does not bear a substantial relationship to its objective of evaluating the child's best interests. As such, Mother requests that we remand this matter to the trial court with instructions to reweigh the R.C. 3109.04(F)(1) factors after removing consideration of section (j).

{¶16}   Whether a statute is unconstitutional is a question of law subject to de novo review. *Designers Choice, Inc. v. Attractive Floorings, LLC*, 2020-Ohio-4617, ¶ 5 (9th Dist.), citing *Goodyear Tire & Rubber Co., v. Aetna Cas. & Sur. Co.*, 2002-Ohio-2842, ¶ 4.  In a de novo review, this Court "has complete and independent power of review. . . ." *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).

{¶17}   Our review of the record reveals that Mother did not make this argument in the trial court. Thus, she is raising it for the first time on appeal.

{¶18}   We have repeatedly held that:

> When reviewing arguments on appeal, this Court cannot consider issues that are raised for the first time on appeal. The Ohio Supreme Court has stated that other than issues of subject matter jurisdiction, reviewing courts do not consider questions not presented to the court whose judgment is sought to be reversed. It is well established that an appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.

*Schierbaum v. Ohio Dept. of Edn.*, 2024-Ohio-1196, ¶ 18 (9th Dist.), citing *State v. Harris*, 2009-Ohio-3865, at ¶ 9 (9th Dist.).  Mother has not argued plain error on appeal and this Court will not develop such an argument on her behalf.  *State v. Samamra*, 2025-Ohio-126, ¶ 55 (9th Dist.) citing *State v. Piatt*, 2020-Ohio-1177, ¶ 25 (9th Dist.).

{¶19}  Therefore, based on Mother's failure to call this argument to the trial court's attention at a time when the alleged error could have been avoided or corrected, and her failure to argue plain error, her first assignment of error will not be considered and is overruled.

### THIRD ASSIGNMENT OF ERROR:

**THE TRIAL COURT VIOLATED *TROXEL* [*V. GRANVILLE*, 530 U.S. 57 (2000)] AND [MOTHER'S] DUE PROCESS RIGHTS IN GRANTING CUSTODY OF [B.C.] TO TANNER[.]**

{¶20}  The verbiage of Mother's assignment of error states that she challenges the court's "granting custody of [B.C.] to Tanner[.]" However, Tanner was not granted custody of B.C.  The trial court granted visitation *only* to Tanner.  Mother's argument in the body of her merit brief clarifies that she challenges the order granting visitation rights to Tanner.  She argues that "[a]bsent a finding that [B.C.]'s parents are unfit, Tanner's visitation with [B.C.] is at the discretion of her parents[,]" resulting in the trial court's "unconstitutional usurpation of [Mother's] parental rights . . . ."

{¶21}  Our review of the record reflects once again that Mother did not raise this argument in the trial court.  In fact, Mother, Williams, and the GAL all testified that they were in favor of Tanner having visitation with B.C. and agreed with the court's frequent declarations throughout the litigation that visitation with Tanner was in B.C.'s best interest due to the strong bond between them.  Also, Mother does not argue plain error.  Therefore, for the same reasons that we overruled Mother's first assignment of error, we also overrule Mother's third assignment of error.  We

caution that we are not deciding whether the Lorain County Juvenile Court had the authority to grant visitation to non-relative third parties as that issue is not properly before us.

## SECOND ASSIGNMENT OF ERROR:

**EVEN IF THE COURT DOES NOT FIND R.C. 3109.04(F)(1)(j) UNCONSTITUTIONAL AS APPLIED TO [MOTHER], THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING TANNER PARENTING TIME AND FINDING [FATHER] THE RESIDENTIAL PARENT.**

{¶22} To the extent that Mother argues the trial court erred in awarding Tanner parenting time, that issue is moot because it was addressed under Mother's third assignment of error.

{¶23} Under this assignment of error, Mother challenges the trial court's designation of Williams as the residential parent for school purposes as not in B.C.'s best interest. Mother argues that she should have been designated the residential parent for school purposes. Mother maintains that since she and Williams live far apart, the trial court's judgment limits her and B.C.'s time together as well as any time B.C. could spend with her two older brothers, and is therefore against B.C.'s best interest. We will address her specific arguments under the applicable statutory factors in further detail below.

{¶24} As we have recently noted,

> [C]ustody issues are some of the most difficult and agonizing decisions a trial judge must make. A trial court therefore possesses broad discretion with respect to its determination of the allocation of parental rights and responsibilities, and its decision will not be overturned absent an abuse of discretion.

(Internal citations and quotations omitted.). *In re B. T-H.*, 2022-Ohio-4139, ¶ 10 (9th Dist.) An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶25} "When a court designates a residential parent and legal custodian, the court is allocating parental rights and responsibilities." *Fisher v. Hasenjager*, 2007-Ohio-5589, ¶ 23. R.C.

3109.04(B)(1) requires that "[w]hen making the allocation of the parental rights and responsibilities for the care of the children. . . in an original proceeding, . . . the court shall take into account that which would be in the best interest of the child[]."  R.C. 3109.04 applies in custody actions filed in juvenile court pursuant to R.C. 2151.23(F)(1) ("The juvenile court shall exercise its jurisdiction in child custody matters in accordance with section[] 3109.04 . . . of the Revised Code.")

{¶26}   R.C. 3109.04(F)(1)(a)-(j) spells out ten factors that the court shall consider when determining the best interest of the child:

> In determining the best interest of a child [under R.C. 3109.04], whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
>
> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;
>
> (e) The mental and physical health of all persons involved in the situation;
>
> (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
>
> (g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
>
> (h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of

the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶27} "While the trial court need not explicitly reiterate its findings with regard to each best interest factor under R.C. 3109.04(F)(1), it must be apparent from the record that the court considered the factors in its decision." *In re B. T-H.*, 2022-Ohio-4139, at ¶ 11 (9th Dist.) "The trial court 'has discretion in determining which factors are relevant,' and 'each factor may not necessarily carry the same weight or have the same relevance, depending upon the facts before the trial court.'" *Krill v. Krill*, 2014-Ohio-2577, ¶ 29 (3d Dist.), quoting *Brammer v. Brammer,* 2013-Ohio-2843, ¶ 41 (3d Dist.).

[A]s to the trial court's findings with respect to the statutory best interest factors, [t]his Court has held that what is in the best interest of a child is primarily a question of fact that should be reversed only if it is against the manifest weight of the evidence. Manifest weight of the evidence pertains to the burden of persuasion. When reviewing the manifest weight of the evidence in a civil case, we must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. . . . *In weighing the evidence, we must always be mindful of the presumption in favor of the finder of fact, [] which arises because the trial judge had an opportunity to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.* While [a] finding of an error in

law is a legitimate ground for reversal, [ ] a difference of opinion on credibility of witnesses and evidence is not. Only in the exceptional case, where the evidence presented weighs heavily in favor of the party seeking reversal, will the appellate court reverse.

(Internal citations and quotations omitted.) (Emphasis added.) *In re B. T-H.,* at ¶ 12.

{¶28} Mother challenges the trial court's findings with respect to all but two of the best interest factors. Mother does not challenge the trial court's findings under R.C. 3109.04(F)(1)(a) (wishes of the child's parents regarding the child's care), and (e) (mental and physical health of all persons involved in the situation).

{¶29} Regarding R.C. 3109.04(F)(1)(b) (If the court has interviewed the child in chambers), the court conducted an in camera interview of all three minor children on July 7, 2021, and an in camera interview of B.C. on June 23, 2023. In its findings, the court elaborated that with respect to the second interview of B.C., it gave little weight to what she expressed because it was "left . . . with the impression that the child was well coached by Mother or someone else and that the child's comments were a direct contradiction from what she had recently told the GAL before the in camera." Mother argues on appeal that the trial court's reason for giving little weight to B.C.'s comments is "speculative and not based on any evidence–entirely ignoring record evidence based on a conjecture that *someone* coached B.C. . . ." (Emphasis in the original.)

{¶30} The court's statement that B.C.'s comments directly contradicted what she had recently told the GAL means that the court was basing its decision on facts, not speculation, *i.e.,* what the child had recently told the GAL prior to the in camera and the fact that those statements were inconsistent with what the child told the court. The trial judge, as the finder of fact, was in a unique position to observe B.C.'s demeanor, gestures, voice inflections, etc., and to determine whether B.C. was being influenced or was answering independently. *See In re B.T-H.,* at ¶ 12. Accordingly, Mother's argument regarding this factor is overruled.

{¶31}  Regarding R.C.3109.04(F)(1)(c) (child's interaction and interrelationship with the child's parents, sibling, and any other person who may significantly affect the child's best interest), the court found that "[b]oth parties testified to having a good relationship with the children." Mother argues on appeal that while Williams claimed he had a good relationship with B.C., the evidence showed he did not.  In support of her argument, Mother states that "[t]he record contains evidence of substantiated complaints about the care [B.C.] receives while in Williams' care, including lack of food and supervision, and that [B.C.] is stricken by fear by Williams' conduct." However, Mother's argument does not cite specifically to any record evidence demonstrating these alleged complaints about lack of food or supervision.  In the "Statement of Facts" section of Mother's merit brief, she challenges some of the trial court's findings and references a well-check of B.C. conducted by the police on May 31, 2023, as well as the resulting police report that allegedly stated B.C. was visibly scared and left alone in Williams' house without food or supervision.  We thus presume Mother is referring to this incident.  She further states that there were other substantiated allegations that Williams left B.C. alone on multiple occasions without food or supervision.

{¶32}  The May 31, 2023, well-check of B.C. occurred *after* the testimony and evidence had concluded and the parties had submitted their closing arguments and proposed judgment entries.  The matter of the well-check was the subject of Mother's post-trial motion for emergency custody filed on June 12, 2023, to which she attached the police report.  The trial court denied the motion after a full hearing on July 27, 2023, during which evidence and testimony were taken. However, the transcript of that hearing is not part of the record transmitted to this Court. Consequently, we cannot determine from the record before us whether the police report was admitted into evidence or whether the police officer testified to the matters contained in the report.

The fact that the police report is attached to Mother's motion does not automatically make it admissible evidence. Accordingly, as Mother relies solely on the police report regarding that event, her argument is not supported by record evidence and is overruled.

{¶33} As for the other allegations of Williams' neglect, Mother states that "Williams testified that there were times when he was on the property but not visible from the house, so [B.C.] would have no idea where he was, even though he was not far away." In support, Mother references a portion of the transcript containing *her own* testimony upon cross-examination by the GAL, not Williams' testimony. Mother testified that on Christmas Day 2022 the police were called to Williams' home because B.C. was allegedly left alone. Mother stated that she was on the phone with B.C. by video and did not see Williams even after B.C. turned the video around several times. Mother did not introduce the video into evidence. Also, Williams' testimony regarding this situation was that he was outside in the driveway shoveling snow. Thus, Mother's argument fails on this point because Williams did not testify as Mother claims he did, nor did she successfully impugn his testimony that he was in the near vicinity of his residence on the day in question.

{¶34} Furthermore, Mother characterizes the evidence of Williams' and B.C.'s allegedly poor relationship and Williams' inability to care for B.C. as "unrefuted." However, the record shows otherwise and in fact reflects negatively on B.C.'s relationship with Mother. In his testimony, Williams described with specificity the meals he cooked for B.C. He further testified that he addressed the concerns about B.C. being too thin with the pediatrician, who told him B.C. was fine. B.C. has her own room at Williams' home and her best friend lives next door. B.C. receives good grades in school and was given the Exceptional Behavior Award four times as well as numerous other awards. She also participates in dance lessons and competitive gymnastics. Williams enrolled B.C. in counseling to address her mental and emotional well-being, whereas

Mother did not follow the court's orders to enroll B.C. in counseling when she was granted interim custody. As noted previously, the GAL testified that B.C. was anxious when with Mother, but happy in Williams' home. Therefore, there was ample evidence refuting Mother's claim that B.C. was suffering in Williams' care. Accordingly, the court's failure to find that B.C. and Williams did not have a good relationship is not against the manifest weight of the evidence.

{¶35} As for R.C. 3109.04(F)(1)(d) (the child's adjustment to the child's home, school, and community), the court found that "[b]oth parties testified they did not have concerns about the children's progress in school. The GAL was unable to access information about the child's school when she was living with her Mother in D.C." Mother argues that the trial court's finding is an implication that she somehow orchestrated the lack of record sharing which is contrary to the evidence and an abuse of discretion. Mother submits that any difficulty the GAL had in accessing information regarding B.C.'s schooling was not attributable to her. Mother points out in particular that during the trial, the court acknowledged the school's uncooperativeness but has now "flipped without explanation" in its decision by blaming Mother.

{¶36} The trial court's statement that "[t]he GAL was unable to access information about the child's school when she was living with her Mother in D.C." does not specifically blame Mother for the difficulty in accessing the school records. It simply notes that this difficulty occurred when B.C. was living with Mother. The trial court ultimately determined that Mother and Williams were on equal footing regarding this issue, noting that neither had concerns about B.C.'s academic status despite the missing records. Thus, the court's finding essentially neutralized the parties and was not used to tip the scales in favor of Williams and against Mother. Therefore, Mother's argument fails because she has not shown that the court treated the school records issue in a manner that prejudiced her.

{¶37}   Regarding R.C.3109.04(F)(1)(f) (The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights), the court found that:

> Mother has alleged that Father has denied [her] parenting time rights, but has never proven that [Williams] has denied [her] court ordered parenting time. Father testified that he is willing to abide by any court-ordered parenting time plan.

> [Williams] has alleged and proven that Mother denied [him] parenting time.

{¶38}   Mother argues that the trial court erred because the court's finding that Mother denied Williams parenting time is not supported by the record and that any missed parenting time was Williams' own fault for refusing to coordinate with Mother and ignoring her communications. We disagree with Mother as there is record evidence supporting the court's decision.

{¶39}   Mother filed two motions for emergency custody of B.C. during the pendency of the case based on Williams' alleged neglect of B.C.  Both motions were denied as meritless.  Also, after Williams was granted interim custody, Mother picked up B.C. from MGM's house in Cleveland while B.C. was visiting with MGM and took her to D.C. without Williams' knowledge or consent.  In addition, B.C. did not get his spring break visit with Williams in 2021 as ordered and Mother never gave a valid reason why that visit was missed.  Moreover, in Mother's own closing argument, she stated that "[it] can be argued that both [Mother and Williams] have demonstrated that they won't comply with court orders."  Thus, contrary to Mother's argument on appeal, Mother acknowledged in the trial court proceedings that an argument could be made that the evidence shows she would not follow court orders.  Mother does not argue on appeal that Williams ever denied her parenting time.  Accordingly, the trial court's finding that Williams would be the parent more likely to facilitate court-ordered parenting time is not against the weight of the evidence.

{¶40} Mother also alleges that the court erred in its findings under R.C. 3109.04(F)(1)(g) (Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor). The trial court found that "[n]o child support is ordered to be paid by any party at this time." Mother argues that this is false because the record shows that Williams has a felony conviction for failure to pay child support for a child from another relationship and that the trial court misread the statute to mean only child support payments in the present case. We disagree with Mother.

{¶41} First, we interpret the trial court's finding to mean that it was not ordering either Mother or Williams to pay child support for B.C. in this case, not as Mother contends that the court was making a finding regarding the parties' child support payment history in other cases as well as this one. Second, as Mother points out in her brief, the court did acknowledge Williams' conviction for failure to pay child support in its finding under R.C. 3109.04(F)(1)(h) (Whether either parent has been convicted of or pleaded guilty to any criminal offense involving the victim/family member in this case.) The court found that "[Williams] has a felony conviction for failure to pay support for his estranged older child." Thus, the court clearly considered it. Last, Williams testified that regarding the support order that gave rise to his felony conviction, he was found to be the putative father; that is, the biological father by default because he did not answer the paternity complaint and did not appear in court. The order was not based on the results of a DNA test or Williams' agreement to a finding of paternity. Williams testified that he eventually paid the support order in full, filed an action to overturn the paternity determination, and was successful in that case. Mother did not challenge Williams' testimony on that issue. Therefore, for all these reasons, Mother's argument here fails.

{¶42} Regarding R.C. 3109.04(F)(1)(i) (Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court.), the trial court stated, "[s]ee findings under paragraph (f)." Mother argues that the trial court erred in treating section (f) interchangeably with section (i) and that the "trial court's analysis of 'paragraph (f)' does not contain any information from which one could determine whether anyone '*continuously and willfully* denied the other parent's right to parenting time in accordance with an order of this court.'" (Emphasis in the original). For the same reasons stated in our analysis under paragraph (f), we disagree with Mother. Mother's behavior of taking asserted steps to thwart Williams' parenting time took place throughout the case and Mother does not offer any record evidence reflecting that her actions were anything other than willful. While she claims that the court's orders regarding whether she could remove the child from Ohio were unclear and subject to another interpretation, this Court does not agree.

{¶43} Regarding R.C. 3109.04(F)(1)(j) (Whether either parent has established a residence, or is planning to establish a residence, outside this state), the trial court found that "neither [Williams] nor Father Tanner testified that they intend to leave the State of Ohio. However, Mother relocated to Washington DC during the pendency of this case and has testified that she intends to stay there." Mother's single argument regarding this factor is that as set forth under her first assignment of error, R.C. 3109.04(F)(1)(j) is unconstitutional as applied to her because it discriminates against her based on her status as a non-Ohio resident and that there is no reason for the court to determine that Ohio is better for a child's best interests than living elsewhere. We have already rejected Mother's argument for the reasons stated in our analysis under her first assignment of error and do so again here. Further, we note that while the court

makes the finding that Mother has moved to D.C., Mother does not seem to place any added weight on her move other than to note it as one of the factors. Mother's argument is overruled.

{¶44} Turning now to R.C. 3109.04(F)(1)(h) (whether either parent has been convicted of or pleaded guilty to any offense involving a victim who was a member of the family or caused physical harm in the commission of the offense). The trial court found that:

> Mother was indicted with a felony of the fourth degree in Portage County on or about November 9, 2017[,] on charges of OVI, refusal to submit to chemical test, driving under suspension, marked lanes violation, and **endangering children.** This was her fourth OVI. . . .

> [Tanner] has had domestic violence charges, felonious assault, and bank fraud charges and served time in a federal prison, but has been free of criminal accusations since then.

> [Williams] has a felony conviction for failure to pay support for his estranged older child.

{¶45} Mother argues that the trial court abused its discretion and erred because under R.C. 3109.04(F)(1)(h), the trial court was required to consider whether any parent "has been *convicted of* or pleaded guilty" but Mother had no convictions or guilty pleas, only indictments/charges, whereas Williams had convictions. We agree that the court erred in apparently conflating Mother's charges with actual convictions. However, considering the substantial competent, credible evidence regarding the other factors that were unfavorable to Mother and favorable to Williams, this finding is harmless error.

{¶46} In her summary argument, Mother submits that the trial court abused its discretion because it based its best interest analysis on punishing Mother. In essence, Mother is arguing that the trial court mischaracterized certain evidence as unfavorable to her and should have weighed evidence that was favorable to her more heavily. Similarly, she argues that the trial court afforded greater weight and credibility to the evidence supporting Williams as the residential parent and legal custodian of B.C. while ignoring the evidence that reflected poorly on Williams. In so doing,

Mother is essentially asking this Court to reevaluate and reweigh the trial court's assessment of the evidence. Again, as a reviewing court, we must keep in the forefront of our analysis that the trial court, as finder of fact, "had an opportunity to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *In re B.T-H.*, 2022-Ohio-4139, at ¶ 12 (9th Dist.). "The decision to credit the testimony of witnesses who testified contrary to [Mother] or presented evidence favorable to [Williams] was a determination inherent in the responsibilities of the trial court in this matter." *Id.* at ¶ 27. It was within the trial court's discretion to give weight to each factor as it saw fit under the circumstances. *Id.*

{¶47} Based on our thorough review of the record, we conclude that the trial court considered the best-interest factors and that its findings regarding the best interest factors are not against the weight of the evidence. In its decision, the trial court explicitly listed and addressed each best interest factor. The trial court's judgment entry reflected careful consideration of the evidence in light of the best interest factors. While evidence was introduced that could be weighed in favor of designating Mother as the residential parent of B.C., we cannot say that the trial court's determination that it was in B.C.'s best interest to designate Williams the residential parent was an abuse of discretion. Mother's second assignment of error is overruled.

III.

{¶48} Based on the foregoing, Mother's assignments of error are overruled. Therefore, the judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
SCOT STEVENSON
FOR THE COURT

CARR, J.
HENSAL, J.
CONCUR.

APPEARANCES:

ALEXANDER J. DURST, PAUL R. KERRIDGE, and MADDIE J. WHILOITE, Attorneys at Law, for Appellant.

EDWARD OSCAR PALM, Attorney at Law, for Appellee.

SHORAIN McGHEE, Attorney at Law, for Appellee.

ANTONIO S. NICHOLSON, Attorney at Law, for minor child.

ANDREA DAVIS, Guardian ad Litem.